IN THE SUPREME COURT OF NORTH CAROLINA

No. 186PA14

(Filed 21 August 2015)

IN THE MATTER OF:  R.R.N.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 757 S.E.2d 503 (2014), reversing an order entered on 22 July 2013 by Judge Pell C. Cooper in District Court, Wilson County. Heard in the Supreme Court on 16 February 2015.

> *Stephen L. Beaman for petitioner-appellant Wilson County Department of Social Services.*
>
> *Tawanda N. Foster, Appellate Counsel, Administrative Office of the Courts, for appellee Guardian ad Litem.*
>
> *Annick Lenoir-Peek, Assistant Appellate Defender, for respondent-appellee mother.*

NEWBY, Justice.

This case requires us to determine whether an adult relative who supervises a child during a sleepover is a "caretaker" of that child under section 7B-101(3) of the Juvenile Code, thus involving the State in the life of the child and her family.  The Juvenile Code defines a "caretaker" in part as "an adult relative entrusted with the juvenile's care."  N.C.G.S. § 7B-101(3) (2013).  Though an adult relative who supervises a sleepover is temporarily responsible for ensuring the child's safety while the child is visiting, such a temporary arrangement does not mean the adult is

"entrusted with" the child's care as contemplated by the Juvenile Code. When, as here, the child's mother and stepfather responded appropriately, the abuse of the child by the adult relative does not warrant the State's intrusion into the family unit. Therefore, we affirm the decision of the Court of Appeals.

At the time of the events at issue, R.R.N. was twelve years old and lived at home with her mother (respondent), stepfather, brother, and stepbrother. R.R.N.'s mother has had full custody of her since birth. Occasionally, R.R.N.'s family visited with and attended cookouts at the home of Mr. B., who is R.R.N.'s stepfather's cousin, and Mr. B.'s family. Mr. B. and his wife have a son, and the couple also had custody of two other children in 2012. During the spring and summer of 2012, Mr. B., who was thirty-six years old at the time, engaged in sexual acts with then-twelve-year-old R.R.N. During one family get-together at Mr. B.'s house, Mr. B. kissed R.R.N. on the lips and with his tongue behind a barn. On another occasion, they "rode a four wheeler into the woods" where R.R.N. performed oral sex on Mr. B, and he fondled her breasts. A short time later, Mr. B. took R.R.N. to Walmart to buy her a birthday present. During the drive back to R.R.N.'s house, Mr. B. stopped at the side of the road, where R.R.N. again performed oral sex on him and he touched her breasts. R.R.N. believed Mr. B. was her boyfriend, and the two made plans for R.R.N. to spend the night at Mr. B.'s house on 18 August 2012 so they could have sexual intercourse. Mr. B. told R.R.N. to keep their relationship secret because otherwise, he could go to jail.

On 18 August 2012, R.R.N.'s mother allowed R.R.N. to spend the night at Mr. B.'s house with Mr. B., his wife, and the three children. That night R.R.N. fell asleep in a bed with one of the other girls. After his wife fell asleep, Mr. B. carried the other girl into another room and returned to the bedroom, where R.R.N. was alone. R.R.N. performed oral sex on Mr. B., and Mr. B. digitally penetrated R.R.N.'s vagina; however, they did not have sexual intercourse.

The next day R.R.N.'s mother picked up R.R.N. from Mr. B.'s house, and R.R.N. discovered that Mr. B. had engaged in sexual relations with a woman who was not his wife. Disappointed and hurt, R.R.N. told her mother that she was in a relationship with Mr. B., and she described the inappropriate sexual conduct between them. R.R.N.'s mother and stepfather sought counseling for R.R.N. and did not allow any further contact between R.R.N. and Mr. B. R.R.N.'s mother also reported the alleged abuse to the Wilson County Department of Social Services (DSS).

DSS filed a petition alleging R.R.N. was an abused and neglected juvenile. The petition stated that Mr. B. was R.R.N.'s "caretaker" on 18 August 2012 when R.R.N. spent a single night at his house. R.R.N.'s mother moved to dismiss DSS's petition under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, arguing that the Juvenile Code did not apply because Mr. B. was not R.R.N.'s caretaker. The trial court disagreed. It concluded that Mr. B. was R.R.N.'s caretaker on 18 August 2012 and adjudicated R.R.N to be an abused and neglected juvenile, thereby allowing the court to assume authority over R.R.N. and her family. The court nevertheless found

that it was in R.R.N.'s best interest that she remain in her mother's custody. R.R.N.'s mother appealed the adjudication of abuse and neglect.

The Court of Appeals reversed the trial court's adjudication, concluding that Mr. B. was not R.R.N.'s "caretaker." *In re R.R.N.*, ___ N.C. App. ___, ___, 757 S.E.2d 503, 506 (2014). The Court of Appeals explained that generally an adult is not a caretaker under the Juvenile Code unless the adult provides extended care. *Id.* at ___, 757 S.E.2d at 506. Therefore, because R.R.N.'s sleepover at Mr. B.'s house was temporary in nature, Mr. B. did not meet the definition of "caretaker." *Id.* at ___, 757 S.E.2d at 506. Accordingly, the Court of Appeals determined that the trial court erred in adjudicating R.R.N. abused and neglected. *Id.* at ___, 757 S.E.2d at 507. We allowed DSS's Petition for Discretionary Review.

"The Juvenile Code strikes a balance between the constitutional rights of a parent and the best interests of a child . . . ." *In re L.M.T.*, 367 N.C. 165, 167, 752 S.E.2d 453, 455 (2013) (citing N.C.G.S. § 7B-100(3) (2011)). Not every child who is a victim of serious criminal conduct is necessarily an abused and neglected juvenile under the Juvenile Code. Only when the family fails to provide proper care is DSS empowered to intervene. In furtherance of this limitation on intervention, the legislature confined the definition of "abused" or "neglected juveniles" to those children who are abused or neglected by a "parent, guardian, custodian, or caretaker." N.C.G.S. § 7B-101(1), (15) (2013). DSS contends that Mr. B. was R.R.N.'s caretaker on 18 August 2012 because (1) he was her adult relative, and (2) her parents

"entrusted" him with her care by allowing her to spend one night at his home. We disagree and hold that, under the totality of the circumstances in this case, Mr. B. was not R.R.N.'s caretaker on 18 August 2012 because he was not "entrusted with [her] care" as intended by the statute.

The Juvenile Code defines "caretaker," in part, as

> [a]ny person other than a parent, guardian, or custodian who has responsibility for the health and welfare of a juvenile in a residential setting. A person responsible for a juvenile's health and welfare means a stepparent, foster parent, an adult member of the juvenile's household, *an adult relative entrusted with the juvenile's care*, any person such as a house parent or cottage parent who has primary responsibility for supervising a juvenile's health and welfare in a residential child care facility or residential educational facility, or any employee or volunteer of a division, institution, or school operated by the Department of Health and Human Services.

*Id.* § 7B-101(3) (emphasis added).

The "caretaker" statute protects children from abuse and neglect inflicted by people with significant, parental-type responsibility for the daily care of a child in the child's residential setting. Stepparents, foster parents, and adult members of the juvenile's household, for example, live with the child in the child's home. Similarly, house parents or cottage parents are in charge of children in nontraditional residential settings, such as dormitories or group residences, where children live for extended periods of time. Therefore, in the context of the statute as a whole, "an adult relative entrusted with the juvenile's care" is a person who has a significant

degree of parental-type responsibility for the child. *See, e.g., In re A.P.*, 165 N.C. App. 841, 844, 846, 600 S.E.2d 9, 11, 13 (2004) (concluding that a step-grandfather was a caretaker after the child lived with him temporarily for eight months). The trial court must consider the totality of the circumstances in determining whether a person is "entrusted with the juvenile's care," including the duration and frequency of care provided by the adult, the location in which that care is provided, and the decision-making authority granted to the adult.

Here, under the totality of the circumstances, Mr. B. was not "entrusted with" R.R.N.'s care on 18 August 2012, when she spent one night at his house for a children's sleepover. Both Mr. and Mrs. B. were present along with three other children, and R.R.N. returned to her mother's home the next day. Mr. B. was not responsible for R.R.N. in her own home. Furthermore, as the Court of Appeals explained, "When a parent or guardian allows a child to attend a sleepover, the parent does not relinquish responsibility over the child's health and welfare." *In re R.R.N.*, ___ N.C. App. at ___, 757 S.E.2d at 506. Though Mr. B. may have been responsible for R.R.N.'s short-term safety while she visited his home for one night, R.R.N.'s mother retained the ultimate decision-making authority over her health and welfare. Therefore, because Mr. B. was not "entrusted with" R.R.N.'s care as contemplated by N.C.G.S. § 7B-101(3), he was not her "caretaker" on 18 August 2012 when he sexually abused her at his home.

This interpretation of the "caretaker" statute is consistent with the Juvenile Code's dual purpose of promoting the best interests of the child while still safeguarding the parent–child relationship from needless State interference. *In re L.M.T.*, 367 N.C. at 167, 752 S.E.2d at 455; *see* N.C.G.S. § 7B-100 (2013) (stating that the purposes and policies underlying the Juvenile Code include: (1) "provid[ing] procedures . . . that protect the constitutional rights of juveniles and parents"; (2) "develop[ing] a disposition . . . that reflects . . . the strengths and weaknesses of the family"; (3) "provid[ing] for services for the protection of juveniles by means that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence"; and (4) "provid[ing] standards . . . for ensuring that the best interests of the juvenile are of paramount consideration by the court").

We recognize that DSS has an important role in protecting children; however, because parents have a fundamental right to parent their children, *In re A.K.*, 360 N.C. 499, 457, 628 S.E.2d 753, 758 (2006), we must "acknowledge the limits within which governmental agencies may interfere with or intervene in the parent–child relationship," *In re Stumbo*, 357 N.C. 279, 286, 582 S.E.2d 255, 260 (2003). Therefore, before subjecting families to ongoing DSS supervision and an array of possible adverse collateral consequences that can flow from an adjudication of abuse or neglect, *see, e.g.*, N.C.G.S. § 7B-903(a)(2)(c) (2013) (stating a court may order that a child be placed in foster care); *id.* § 7B-904(c) (2013) (authorizing a court to order parents to undergo psychological treatment); *In re A.K.*, 360 N.C. at 458, 628 S.E.2d

at 759 ("[A] stigma is likely to attach to a person who abuses or neglects his or her child."), trial courts should consider the purposes of the Juvenile Code when determining whether intervention is necessary to protect the welfare of the child. If not, DSS should not intervene. Ultimately, the best interest of the child is the lodestar, but if parents act appropriately to protect their child, their constitutional right to rear that child is paramount. *See Troxel v. Granville*, 530 U.S. 57, 68-69, 120 S. Ct. 2054, 2061, 147 L. Ed. 2d 49, 58 (2000) (plurality) ("[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").

Here none of the purposes of the Juvenile Code are met by subjecting R.R.N.'s family to DSS supervision because of Mr. B.'s conduct on 18 August 2012. An adjudication of abuse and neglect neither promotes R.R.N.'s best interest nor protects her mother's fundamental right to parent her child. DSS's petition does not allege that R.R.N. was abused or neglected by her mother or stepfather, the two adults responsible for her care on a daily basis in her own home. To the contrary, R.R.N.'s mother and stepfather took appropriate steps to ensure R.R.N.'s safety, and the trial court released her into her mother's custody. Because R.R.N. was safe in her own home, there was no reason for DSS to assert its authority over her and her family under these circumstances.

Accordingly, under the facts of this case, we hold that Mr. B. was not "entrusted with" R.R.N.'s care as contemplated by section 7B-101(3) of the Juvenile Code. At most, Mr. B. acted as R.R.N.'s supervisor for one night on one occasion, while her mother maintained responsibility for her daughter's health and welfare at all times. Although Mr. B.'s conduct should result in criminal charges, R.R.N.'s mother and stepfather responded appropriately, and the family did not require State intervention to ensure R.R.N.'s safety. Therefore, because Mr. B. was not R.R.N.'s "caretaker" when he sexually abused her on 18 August 2012, the trial court erred in adjudicating her an abused and neglected juvenile. We affirm the decision of the Court of Appeals.

AFFIRMED.