IN THE SUPREME COURT OF NORTH CAROLINA

No. 440PA14

Filed 18 December 2015

STATE OF NORTH CAROLINA

v.

JOSHUA WINKLER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, ___ N.C. App. ___, 767 S.E.2d 150 (2014), vacating a judgment entered on 7 November 2013 by Judge William H. Coward in Superior Court, Buncombe County. Heard in the Supreme Court on 5 October 2015.

> *Roy Cooper, Attorney General, by Barry H. Bloch, Assistant Attorney General, for the State-appellant.*
>
> *Craig M. Cooley for defendant-appellee.*

ERVIN, Justice.

The sole issue presented for our consideration in this case is whether the record contains sufficient evidence to support defendant's conviction for conspiracy to traffic in more than four, but less that fourteen, grams of opium in violation of N.C.G.S. § 90-95(h)(4)(a). After examining the evidence utilizing the applicable standard of review, we conclude that the State presented sufficient evidence to support the jury's determination that defendant agreed with another individual to traffic in opium by

transportation. In light of that determination, we reverse the Court of Appeals' decision to vacate the trial court's judgment and remand this case to the Court of Appeals for the purpose of allowing it to address defendant's remaining challenge to the trial court's judgment. *State v. Winkler*, ___ N.C. App. ___, 767 S.E.2d 150, 2014 WL 6433161, at \*4-5 (2014) (unpublished).

On 2 April 2013, the Buncombe County grand jury returned a bill of indictment charging defendant with conspiracy to traffic in at least four, but less than fourteen, grams of opium in violation of N.C.G.S. § 90-95(h)(4)(a). More specifically, the grand jury alleged that, on 16 January 2013, defendant "conspire[d] with Jamie Thomas Harris to commit the felony [of] Trafficking in Opium or Heroin, by transporting in excess of 4 grams but less than 14 grams of a mixture containing Oxycodone, an opium derivative, . . . which is included in Schedule II of the North Carolina Controlled Substances Act."[1] The charge against defendant came on for trial before the trial court and a jury at the 4 November 2013 criminal session of the Superior Court, Buncombe County. At trial, the State relied on circumstantial, as opposed to direct, evidence for the purpose of establishing that defendant had conspired with Mr. Harris to traffic in Oxycodone. After the State presented its case in chief, defendant unsuccessfully moved to dismiss the conspiracy charge, arguing that the evidence

---

[1] The North Carolina Controlled Substances Act is codified in Article 5 of Chapter 90 of the North Carolina General Statutes. *See* N.C.G.S. § 90-86 (2013) (stating that Article 5 of Chapter 90 "shall be known and may be cited as the 'North Carolina Controlled Substances Act' "). "Oxycodone" is explicitly listed as a "Schedule II controlled substance[ ]" in N.C.G.S. § 90-90(1)(a)(14). *Id.* § 90-90(1)(a)(14) (2013).

was insufficient to establish that (1) defendant and Mr. Harris had formed an agreement to traffic in Oxycodone by transportation and (2) the Oxycodone pills had been "transported." Upon announcing his decision to rest without presenting evidence, defendant unsuccessfully renewed his dismissal motion, which was predicated on the same grounds that had been asserted in support of the dismissal motion that he had made at the conclusion of the State's evidence. On 6 November 2013, the jury returned a verdict convicting defendant as charged. After accepting the jury's verdict, the trial court entered a judgment on 7 November 2013 sentencing defendant to an active term of 70 to 93 months imprisonment and ordering defendant to pay $54,320.50 in costs, fines, and fees. Defendant noted an appeal to the Court of Appeals from the trial court's judgment.

On appeal to the Court of Appeals, defendant argued that the trial court had erred by denying his dismissal motion on the grounds that the evidence developed at trial did not suffice to establish that (1) defendant and Mr. Harris had entered into an agreement to traffic in Oxycodone and (2) the Oxycodone had been "transported." A unanimous panel of the Court of Appeals concluded that "the trial court erred by denying [defendant's] motions to dismiss because the State presented insufficient evidence that [defendant] conspired or formed an agreement with Mr. Harris to traffic in Oxycodone." *Winkler*, 2014 WL 6433161, at *2. As a result, the Court of Appeals vacated the trial court's judgment without addressing defendant's challenge to the sufficiency of the evidence to establish that the Oxycodone had been "transport[ed]."

*Id.* at \*4.  On 9 April 2015, we allowed the State's request for discretionary review of

the Court of Appeals' decision.

> "In ruling on a motion to dismiss, the trial court need
> determine only whether there is substantial evidence of
> each essential element of the crime and that the defendant
> is the perpetrator."  Substantial evidence is that amount of
> relevant evidence necessary to persuade a rational juror to
> accept a conclusion.

*State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (citations omitted) (quoting

*State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998)), *cert. denied*, 537 U.S.

1005, 123 S. Ct. 495, 154 L. Ed. 2d 403 (2002).  In ascertaining whether the record

contains substantial evidence tending to show the existence of an element of a

criminal offense:

> The evidence is to be considered in the light most
> favorable to the State; the State is entitled to every
> reasonable intendment and every reasonable inference to
> be drawn therefrom; contradictions and discrepancies are
> for the jury to resolve and do not warrant dismissal; and
> all of the evidence actually admitted, whether competent
> or incompetent, which is favorable to the State is to be
> considered by the court in ruling on the motion.

*State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980) (citations omitted).

According to well-established North Carolina law:

> Circumstantial evidence may be utilized to overcome
> a motion to dismiss " 'even when the evidence does not rule
> out every hypothesis of innocence.' " [*State v.*] *Thomas*, 350
> N.C. [315,] [343], 514 S.E.2d [486,] 503 (quoting *State v.
> Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988))[, *cert.
> denied*, 528 U.S. 1006, 120 S. Ct. 503, 145 L. Ed. 2d 388
> (1999)].   If  the  trial  court  finds  substantial  evidence,

> whether direct or circumstantial, or a combination, "to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988). If, however, the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed." *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

*State v. Golphin*, 352 N.C. 364, 458, 533 S.E.2d 168, 229-30 (2000), *cert. denied*, 532 U.S. 931, 121 S. Ct. 1379, 149 L. Ed. 2d 305, and *cert. denied*, *id.* at 931, 121 S. Ct. at 1380, 149 L. Ed. 2d at 305 (2001).

N.C.G.S. § 90-95(h)(4)(a) provides that any person "who sells, manufactures, delivers, transports, or possesses four grams or more of opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate[,] . . . or any mixture containing such substance, shall be guilty of a felony which felony shall be known as 'trafficking in opium or heroin' " and shall be punished as a Class F felon "if the quantity of such controlled substance or mixture involved . . . [i]s four grams or more, but less than 14 grams." N.C.G.S. § 90-95(h)(4)(a) (2013). "The penalties provided in subsection (h) of this section . . . also apply to any person who is convicted of conspiracy to commit any of the offenses described in subsection (h) of this section." *Id.* § 90-95(i) (2013).

"A criminal conspiracy is an agreement between two or more people to do an unlawful act or to do a lawful act in an unlawful manner. In order to prove

conspiracy, the State need not prove an express agreement; evidence tending to show a mutual, implied understanding will suffice." *State v. Morgan*, 329 N.C. 654, 658, 406 S.E.2d 833, 835 (1991) (citations omitted).

> Direct proof of [a conspiracy] charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy. When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists.

*State v. Whiteside*, 204 N.C. 710, 712-13, 169 S.E. 711, 712 (1933) (citations omitted). We will now review the sufficiency of the evidence adduced at trial to support defendant's conviction in light of the applicable standard of review.

In January 2013, probation and parole officer Melissa Whitson received information that Jamie Harris, a probationer subject to Officer Whitson's supervision, was selling Oxycodone out of his residence. As a condition of his probation, Mr. Harris was required, among other things, to submit to warrantless

searches of his person, premises, and vehicle for anything that was reasonably related to his supervision.

On 16 January 2013, Officer Whitson contacted Mr. Harris and requested that he come to her office. A drug test administered to Mr. Harris at the time that he came to Officer Whitson's office for the requested visit was positive for Oxycodone. In view of the fact that she had received information to the effect that Mr. Harris was not living at the location that he had provided to the probation office, Officer Whitson asked Mr. Harris where he was living. In response, Mr. Harris said that "he had been staying . . . some" at 83 Dix Creek Chapel Road and that he was planning to move to that residence on a permanent basis in the near future. Although he was required to keep Officer Whitson informed in the event that he changed his address, Mr. Harris had not told any representative of the probation office that he had already moved to the Dix Creek Chapel Road address. In light of the information that she had developed, Officer Whitson and two other officers transported Mr. Harris to the Dix Creek Chapel Road residence for the purpose of searching it.

Upon arriving at the residence, which was a two bedroom mobile home, the officers encountered Mr. Harris' girlfriend, Crystal Green, and Mr. Harris' minor son. While searching the mobile home, the officers found various items of drug paraphernalia associated with intravenous drug use, including needles, a spoon containing a partially melted pill, and tourniquets, plus a firearm.

As Officer Whitson entered the living room to converse with one of the other officers and to question Mr. Harris about the firearm, a United States mail carrier knocked at the door for the purpose of delivering a package addressed to "Jamie Harris, 83 Dix Creek Chapel Road, Asheville, North Carolina 28806." The package, which had been sent using priority mail, required a signature confirmation that had been requested by "J. Winkler, 1219 Everglades Avenue, Clearwater, Florida 33764."

In spite of the fact that he "seemed nervous" when the package arrived, Mr. Harris consented to the officers' request to open it. Upon opening the package, the officers found a prescription pill bottle from which all identifying labels and other information had been removed. Inside the bottle, into which tissue that prevented the contents from rattling or making any other noise had been inserted, the officers found sixty pills. After making this discovery, Officer Whitson contacted the poison control center for the purpose of ascertaining the identity of the pills that had been discovered in the bottle and was told that they contained Oxycodone. According to a subsequent analysis performed by Amanda Battin, a forensic scientist with the North Carolina State Crime Laboratory, each of these pills contained thirty milligrams of Oxycodone, a Schedule II opium derivative; twenty of the pills had been made by one manufacturer and the remaining forty pills had been made by another, and the sixty pills had a total combined weight of 6.01 grams.

In light of the report that she had received to the effect that Mr. Harris might have been selling drugs, the quantity of Oxycodone pills contained in the unmarked

prescription bottle, and the fact that Mr. Harris "confirmed" the information that she had received concerning his involvement in drug-related activities, Officer Whitson contacted the Buncombe County Anti-Crime Taskforce for the purpose of having further investigative activities performed. Approximately fifteen to twenty minutes later, Officer Tammy Bryson and Agent Amy Seed, who worked with the drug diversion unit of the Buncombe County Anti-Crime Taskforce, arrived at the Dix Creek Chapel Road residence. At that time, Officer Whitson handed Officer Bryson the package containing the pill bottle.

As of the date of defendant's trial, Officer Bryson had been a law enforcement officer for eighteen years and had conducted "hundreds of drug diversion" investigations.[2] According to Officer Bryson, "Oxycodone and most of the opiates" were the primary prescription medications involved in drug diversion activities. A single thirty milligram Oxycodone pill had a street value of approximately $30.00. As a result, the pills contained in the package that had been shipped to Mr. Harris had a street value of approximately $1,800.00.

Based upon her training and experience, Officer Bryson concluded that the condition of the bottle in which the sixty pills were contained reflected the existence of drug diversion activities. According to Officer Bryson, officers frequently encounter

---

[2] According to Officer Bryson, "drug diversion" occurs when a legal drug, such as a prescription medication, is redirected and used illegally or in a manner differing from the purpose for which the drug in question was originally prescribed.

pill bottles from which the labels and other identifying information have been removed during drug diversion investigations. Also, given that individuals are not permitted to ship medications by mail, pill bottles utilized in drug diversion activities are frequently stuffed with tissue to muffle any sounds that the pills might make during the transmission process.

In addition, Officer Bryson suspected that Mr. Harris was involved in drug diversion activities based on the location from which the package in question had been sent. According to Officer Bryson, Florida was a primary "hub" or source state from which unlawfully diverted drugs entered Buncombe County. Officer Bryson had investigated individuals who had transported several hundred to more than a thousand pills dispensed from Florida pharmacies as a result of the fact that Florida did not have "a prescription monitoring system" that law enforcement officers could utilize for the purpose of tracking and investigating prescriptions for controlled substances.

After arresting Mr. Harris, Officer Bryson and Agent Seed began attempting to determine the identity of "J. Winkler," who had sent the package containing the pills to Mr. Harris. As part of that process, the officers listened to recordings of the phone calls that Mr. Harris made from jail. In a phone conversation that occurred on 17 January 2013, Mr. Harris mentioned an individual named "Josh" and stated that Josh was "in town."

The next day, Officer Bryson and Agent Seed learned that there was an individual named Joshua Winkler, who had a Farmville, North Carolina address and possessed both North Carolina and Florida driver's licenses. Upon obtaining that information, Agent Seed returned to the Dix Creek Chapel Road residence for the purpose of conducting surveillance activities there. At the Dix Creek Chapel Road residence, Agent Seed observed the presence of a vehicle that had not been there on 16 January 2013; however, Agent Seed was unable to ascertain the number of the license plate attached to the vehicle at that time. On 22 January 2013, Officer Bryson observed that the vehicle in question bore a North Carolina license plate that was registered to Joshua Winkler of 4281 West Pine Street in Farmville.

On 28 January 2013, an officer employed by the Asheville Police Department observed defendant leaving the Dix Creek Chapel Road residence and stopped his vehicle. After Officer Bryson and Agent Seed arrived at the scene of the traffic stop, they informed defendant that they were law enforcement officers and asked to speak with him. In response to that request, defendant joined Officer Bryson in the front seat of her vehicle. At that point, Officer Bryson informed defendant that she and Agent Seed wanted to discuss the package that he had sent to Mr. Harris and advised defendant of his rights against compulsory self-incrimination. After defendant executed a rights waiver form and indicated that he was willing to speak with Officer Bryson and Agent Seed, Officer Bryson questioned defendant while Agent Seed took notes.

In the course of his conversation with Officer Bryson and Agent Seed, defendant admitted that he had mailed the Oxycodone pills to Mr. Harris, claimed to be the owner of the pills contained in the package that had been addressed to Mr. Harris, and asserted that he had a prescription for thirty milligram Oxycodone pills. Although defendant lived in Farmville, defendant told the officers a doctor practicing in Miami had written his Oxycodone prescription. Defendant also told the officers that his North Carolina physician had refused to prescribe Oxycodone for him as a result of the fact that he was on probation for "doctor shopping."[3] Defendant claimed to have come from Florida to Buncombe County for the purpose of visiting "several grandchildren" and stated that he had visited a couple of his other grandchildren before arriving at Mr. Harris' residence for the purpose of visiting Mr. Harris' son, who was also defendant's grandson.

In the course of his conversation with Officer Bryson and Agent Seed, defendant acknowledged that he knew that "Mr. Harris did pills and sold pills." When asked why he had chosen to mail his Oxycodone pills to Mr. Harris' residence, defendant initially stated that he had acted in this manner because he did not want to travel to North Carolina with the pills in his possession and believed that he would arrive at Mr. Harris' residence before the package containing the pills was delivered.

---

[3] Officer Bryson described "doctor shopping" as an offense in which an individual obtains or seeks to obtain a prescription from a health care practitioner after having already obtained the same prescription from another practitioner without disclosing the existence of the initial prescription to the practitioner from whom the subsequent prescription had been sought or obtained.

Defendant could not provide any response to Officer Bryson's request for an explanation of the reason that defendant did not want to travel with medication that had been prescribed for him and that he claimed to need. In addition, defendant could not provide any explanation for his decision to place the pills in an unmarked bottle into which tissue had been stuffed and to send the pills to Mr. Harris in light of his knowledge that Mr. Harris used drugs and engaged in unlawful drug transactions.

Defendant told Officer Bryson and Agent Seed that the last occasion on which he had filled his prescription was on 14 January 2013, when he obtained one hundred twenty, thirty milligram Oxycodone pills. At that point, defendant kept half of the pills and sent the other half to Mr. Harris. Although defendant claimed that he took three Oxycodone pills each day, none of the sixty pills that defendant said that he had kept in his possession remained by the time that defendant came to North Carolina. Defendant claimed that his probation officer knew that he took Oxycodone and asserted that he had never produced a positive result when tested for the presence of that medication at the request of his probation officer.

Officer Bryson found defendant's description of the manner in which he obtained, used, and mailed the Oxycodone pills to be "unusual" given that, in order for defendant's account to be true, he would have had to have consumed sixty pills in a couple of days. In addition, Officer Bryson expressed an inability to understand how defendant could have failed to test positive for the presence of Oxycodone. After defendant stated that his claim to this effect should be deemed to be credible because

Oxycodone left an individual's system within a day, Officer Bryson reminded defendant that he had admitted consuming Oxycodone three times each day. After this exchange, defendant refrained from engaging in any further discussion of the extent to which he had ever tested positive for the presence of Oxycodone.

In seeking to persuade us to overturn the Court of Appeals' decision, the State argues that the Court of Appeals failed to correctly apply the established standard for evaluating a challenge to the denial of a motion to dismiss for insufficiency of the evidence and that, when the evidence contained in the present record is evaluated and all reasonable inferences permitted by that evidence have been drawn, the State presented more than enough evidence to permit a jury to conclude that defendant and Mr. Harris agreed to traffic in Oxycodone by transportation as part of a drug diversion scheme. Defendant, on the other hand, argues, in reliance upon *State v. Massey*, 76 N.C. App. 660, 662, 334 S.E.2d 71, 72 (1985), that the record evidence shows, at most, the existence of a relationship between defendant and Mr. Harris arising from Mr. Harris' status as the father of defendant's grandson and that evidence of such a relationship, without more, does not sufficiently establish the existence of an unlawful conspiracy. In addition, defendant notes that the record contains no evidence tending to show that defendant and Mr. Harris had communicated in any way, such as by telephone, text message, or e-mail, concerning their alleged agreement to transport Oxycodone despite the fact that they lived in different states.

We find the position espoused by the State to be more persuasive than the position espoused by defendant.

When viewed in the light most favorable to the State, the record tends to show that defendant sent sixty Oxycodone pills in an unmarked pill bottle that was packed to prevent its contents from making any noise to an individual that defendant knew to have a history of using and dealing in controlled substances. Defendant acted in this manner despite the fact that he claimed to have a valid Oxycodone prescription, that he could have lawfully travelled from Florida to North Carolina with these Oxycodone pills in his possession, and that he could have sent the package containing the Oxycodone pills to the residences occupied by any of the multiple grandchildren with whom he planned to visit. In addition, Mr. Harris manifested obvious signs of nervousness at the time that he received the package that contained the bottle of pills.[4] Moreover, the fact that defendant knew that Mr. Harris had begun to spend time at the Dix Creek Chapel Road address and elected to send the Oxycodone pills to him at that address even though Mr. Harris' probation officer was ignorant of the fact that Mr. Harris had been staying there tends to support an inference that defendant and Mr. Harris had been in communication with each other. Finally, defendant was unable to offer any logical explanation for the inconsistencies and logical flaws inherent in the account of his conduct that he provided to Officer Bryson,

---

[4] Defendant's argument that many people become nervous during encounters with law enforcement officers goes to the weight, rather than the sufficiency, of the State's evidence.

including his failure to arrive at the Dix Creek Chapel Road residence before the package containing the pill bottle was delivered and his inability to explain what happened to the sixty pills that he claimed to have retained in his possession after mailing the package containing the pill bottle to Mr. Harris. Although defendant denied having been engaged in drug diversion activities with Mr. Harris and offered an innocent explanation for his conduct, this Court has clearly stated that "[c]ircumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Thomas*, 350 N.C. at 343, 514 S.E.2d at 503 (quoting *State v. Stone*, 323 N.C. at 452, 373 S.E.2d at 433). As a result, for the reasons set forth above, we believe that the record, when taken in the light most favorable to the State and when all reasonable inferences permitted by that evidence are drawn in favor of the State, shows much more than a "suspicion or conjecture" of defendant's guilt and provides ample support for the jury's determination that defendant conspired with Mr. Harris to traffic in at least four, but less than fourteen, grams of Oxycodone by transportation. *Golphin*, 352 N.C. at 458, 533 S.E.2d at 229.

The arguments that defendant has advanced in support of the result reached in the Court of Appeals' decision rest, in our opinion, upon a misapprehension of the applicable law. Although defendant correctly notes that he and Mr. Harris were located in different states at the time that they allegedly formed their agreement to traffic in cocaine and that the record is devoid of any direct evidence tending to show

that the two men had communicated by telephone, text message, or e-mail concerning their alleged plan to engage in drug diversion activities, the absence of such evidence does not conclusively resolve the issue that is currently before this Court. Simply put, while the presence or absence of such evidence is certainly relevant to the issue of defendant's guilt or innocence, the State is not required to attempt to prove defendant's guilt in any particular manner. In addition, defendant's emphasis upon the absence of direct evidence that he and Mr. Harris had entered into an agreement to traffic in Oxycodone by transportation is inconsistent with the principle that the agreement necessary to support a conspiracy conviction can be established by either direct or circumstantial evidence, or both. Similarly, defendant's reference to this Court's decisions requiring that the circumstantial evidence utilized to establish the existence of an unlawful conspiracy point "unerringly" to the defendant's guilt overlooks the fact that the same decision in which that language initially appeared indicates that circumstantial evidence can establish the existence of a conspiracy despite the defendant's explicit denial that such an agreement ever existed, *Whiteside*, 204 N.C. at 712-13, 169 S.E. at 712, and the fact that this Court has stated that the circumstantial evidence utilized to properly establish a defendant's guilt need not eliminate "every hypothesis of innocence," *Thomas*, 350 N.C. at 343, 514 S.E.2d at 503. Finally, although defendant correctly cites the Court of Appeals' decision in *Massey* for the proposition that the mere existence of a relationship between two individuals is not, standing alone, sufficient to establish that a

defendant entered into an unlawful agreement with another person, the evidence contained in the present record permits a reasonable inference that there was much more than a mere relationship between defendant and Mr. Harris. As a result, given our conclusion that the record evidence, when considered in the light most favorable to the State, tends to show that defendant agreed with Mr. Harris to traffic in at least four, but not more than fourteen, grams of Oxycodone, by transportation, the Court of Appeals' decision is reversed and this case is remanded to the Court of Appeals for consideration of defendant's remaining challenge to the trial court's judgment.

REVERSED AND REMANDED.