IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-644

Filed 18 February 2026

Avery County, No. 22CR000028-050

STATE OF NORTH CAROLINA

       v.

LUIS ALBERTO SANCHEZ, Defendant.

Appeal by defendant from judgment entered 21 September 2023 by Judge R. Gregory Horne in Superior Court, Avery County. Heard in the Court of Appeals 10 June 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Reginaldo E. Williams, Jr., for the State.*
>
> *Joseph P. Lattimore for defendant-appellant.*

STROUD, Judge.

Defendant Luis Alberto Sanchez appeals his convictions for contributing to the abuse of a juvenile and willfully failing to discharge his duties of office. He argues that the trial court erred in denying his motions to dismiss. The State's evidence showed that Defendant, a sheriff's deputy and school resource officer, encouraged a 17-year-old girl in a Police Explorers program to tase herself. Defendant acted irresponsibly, violated department standards on taser use, and endangered the juvenile. But the State failed to present evidence supporting the statutory elements

of the specific criminal charges on which Defendant was indicted. We therefore vacate both convictions.

## I. Background

On 24 January 2022, a grand jury in Avery County returned an indictment charging Defendant with one count of contributing to the abuse of a juvenile and one count of willfully failing to discharge his duties of office. *See* N.C. Gen. Stat. §§ 14-316.1 (2021) (Contributing to delinquency and neglect by parents and others), 14-230 (2021) (Willfully failing to discharge duties). The case was tried in September 2023.

The evidence tended to show that in June 2021, seventeen-year-old Ann[1] had just completed her junior year of high school. Since her freshman year, she had participated in the Police Explorers program—a program that let students "experience . . . an average day" of a police officer through "simulations," "traffic stops," and "ride-alongs." Defendant, an Avery County Sheriff's deputy and school resource officer, helped run the program.

On 26 June 2021, Defendant invited Ann on an afternoon ride-along beginning around 4:00 or 5:00 p.m. During the shift, they had dinner with Deputy Joshua Marshall, other officers, and an intern. What happened at dinner was disputed. Ann testified that she sat "in the booth with . . . Marshall on one side and [Defendant] on the other," and that "they would unhook their tasers and act like they were going to

---

[1] We use a pseudonym to protect the identity of the minor child involved in the incident and the other student intern.

tase[ ]" her. Marshall told a different story. He said that there was no mention of tasers or tasing at dinner. The object used to scare Ann was "a cell phone or something off the table."

After dinner, Defendant and Ann returned to the Avery County Sheriff's Office parking lot before driving to a "building behind Mayland Community College," where the officers "used to wash their trucks." There, Ann testified, Defendant told her that "she would be tased that night and that there was nothing she could do about it." While Ann sat in a patrol truck, Marshall climbed in, grabbed her phone, and hit record. Defendant then opened the door and drew his taser near Ann's leg—but he didn't tase her. Ann testified that she was afraid.

Ann also recalled Defendant "mentioned that [he] could taser [Kyle]," the other intern. Defendant then walked to Kyle's car and tased him in the arm. Kyle "jerked his arm back and was in a state of confusion." But Defendant just "laughed it off."

The group then moved inside the building. Ann stated that Marshall and Defendant told her to tase herself. She felt nervous and scared. When she told them she felt like she might pass out, they told her to sit down. Then, Ann testified, Defendant told her if she didn't stop sweating, he would kill her. She realized the situation had become serious and felt powerless to stop it. Both Marshall and Defendant said that they would tase her if she didn't do it herself.

At some point, Ann used Marshall's taser on her own leg. She ran to the truck crying. Ann testified that Defendant told her afterward that she "was not allowed to

tell anyone," that "it was [their] secret," and that she "would get in trouble" if she told. He also said they should keep it between them because it would violate the Avery County Sheriff's Office policy on taser use.

Marshall testified to a different sequence of events. In his version, Ann had repeatedly asked law enforcement officers about being tased and had "made several comments about wanting to be tased in front of several different ranking officials with the Sheriff's office." That evening, Marshall said, Ann handed him her cell phone and asked him to record her. While holding the taser, Ann repeatedly turned it on and off, saying "I'm going to do it," before changing her mind. She did this several times. Marshall stated that the deputies moved forward to retrieve the taser, but Ann refused to give it back and said she would use it. When Ann tased herself, Marshall heard her yell and then begin giggling. Afterward, she appeared to be "just laughing and enjoying life."[2]

At trial, the State introduced the Avery County Sheriff's Office policy on taser use. The policy included guidelines on how officers should use tasers in "an official setting when . . . executing their duties of office." It addressed limitations on taser use with certain persons and cautioned against using tasers on sensitive parts of the body.

SBI Agent Maggie Holder testified about sheriff's deputies' duties, including

---

[2] Ann explained her laughter this way: "I have a nervous laugh, so when something is stressful or nervous happens, I laugh because I can't control it."

the duty to "enforc[e] criminal laws in North Carolina." School resource officers, she added, have the specific responsibility to protect children in their schools. Agent Holder also described her interviews with Defendant. During those interviews, Defendant admitted asking Ann not to report him after she tased herself. And he confirmed that he had tased other participants in the Police Explorers program.

After the State rested its case, Defendant moved to dismiss both charges. The trial court denied the motions. Defendant renewed his motions after presenting his own evidence, and the court again denied them.

On 21 September 2023, a jury found Defendant guilty of contributing to the abuse of a juvenile under North Carolina General Statute Section 14-316.1 and willfully failing to discharge his duties of office under North Carolina General Statute Section 14-230. The trial court sentenced Defendant to forty-five days of confinement, suspended for eighteen months of supervised probation, on each count.

Defendant gave oral notice of appeal in open court.

## II.    Analysis

Defendant argues that the trial court erred in denying his motions to dismiss. We agree.

This Court reviews the denial of a motion to dismiss to determine whether "substantial evidence" (1) supports "each essential element of the crime" and (2) shows "that the defendant is the perpetrator." *State v. Golder*, 374 N.C. 238, 249, 839 S.E.2d 782, 790 (2020) (quoting *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824,

826 (2015)). Substantial evidence is the "amount . . . necessary to persuade a rational juror to accept a conclusion." *Id.* We view the evidence "in the light most favorable to the State," giving it "every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* "[W]hether the State presented substantial evidence of each essential element of the offense is a question of law," which we review *de novo.* *Id.* (quoting *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018)).

## A. Contributing to the Abuse of a Juvenile

Section 14-316.1 makes it a Class 1 misdemeanor for any adult to "knowingly or willfully cause[ ], encourage[ ], or aid[ ] any juvenile within the jurisdiction of the court to be in a place or condition, or to commit an act *whereby the juvenile could be adjudicated . . . abused . . . as defined by [North Carolina General Statute Sections] 7B-101 and 7B-1501.*" N.C. Gen. Stat. § 14-316.1 (emphasis added). Adjudicating a juvenile as "abused" is a specific legal process governed by statute. Section 14-316.1 incorporates the definition of an "abused juvenile" by reference to Section 7B-101. That section defines "abused juvenile" several ways, but the trial court instructed the jury on only one: Section 7B-101(1)(b). Under that provision, an "abused juvenile" is one whose "parent, guardian, custodian, or caretaker" "[c]reates or allows to be

created a substantial risk of serious physical injury to the juvenile by other than accidental means." N.C. Gen. Stat. § 7B-101(1)(b) (2021).[3]

The indictment charged Defendant with "caus[ing], encourag[ing], or aid[ing]" Ann "to commit an act, being tased by an Avery County Sheriff's Officer taser, whereby [she] could be adjudicated abused." Defendant claims that the State failed to prove he "encouraged [Ann] to be in a condition where she could be adjudicated abused." The State, in his view, had to show that one of four people—Ann's parent, guardian, custodian, or caretaker—created or allowed the risk to Ann, and that his conduct contributed to it. But the evidence shows no connection to any of them. Defendant acknowledges that encouraging a juvenile to tase herself "is contemptible conduct," but it doesn't violate Section 14-316.1 without proof "of the requisite impact on the relationships with which the Juvenile Code is concerned."

A conviction under Section 14-316.1 requires the State to meet "two different standards of proof." *State v. Stevens*, 228 N.C. App. 352, 356, 745 S.E.2d 64, 67 (2013).

---

[3] The General Assembly recently amended this provision. *See* An Act to Make Various Changes to the Laws Affecting Juvenile and Associated Services, County Social Services Boards and Departments, Regional Social Services Boards and Departments, Consolidated Human Services Boards and Agencies, and the North Carolina Department of Health and Human Services, to Expand Guardianship Assistance Program Eligibility to Youth Ten Years of Age, to Allow a Judge to Issue a Permanent No Contact Order Against a Defendant Convicted of Certain Violent Offenses, to Provide That it is Felony Child Abuse for Any Person Providing Care to or Supervision of a Child Less Than Sixteen Years of Age to Commit or Allow the Commission of a Sexual Act Upon the Child, and to Provide That Counties and Cities Require Criminal History Record Checks for Applicants Offered a Position if the Position Requires the Applicant to Work with Children in Any Capacity, S.L. 2025-16, § 1.1, https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2025-2026/SL2025-16.pdf. These amendments do not affect our analysis.

First, the State must prove "beyond a reasonable doubt" that the defendant "knowingly or willfully caused, encouraged, or aided the juvenile to be in a place or condition whereby the juvenile could be adjudicated [abused]." *Id.* Second, the State must show "by clear and convincing evidence" that the juvenile qualifies as abused under Section 7B-101. *Id.* (citing N.C. Gen. Stat. § 7B-805 (2011)). Put differently, the State had to prove Defendant "knowingly or willfully cause[d], encourage[d], or aid[ed]" Ann "to be in a place or condition, or to commit an act," N.C. Gen. Stat. § 14-316.1, whereby Ann's parent, guardian, custodian, or caretaker "create[d] or allow[ed]" a "substantial risk of physical injury" to her, N.C. Gen. Stat. § 7B-101(1)(b).

Defendant doesn't dispute that Ann faced a "substantial risk of serious physical injury . . . by other than accidental means." But the State did not present evidence of the required connection to a parent, guardian, custodian, or caretaker. Ann's parents were not present during the ride-along. No guardian or custodian was involved. And although Defendant may appear to have been acting as a "caretaker" for Ann in the colloquial sense, he was not a "caretaker" as defined by the relevant statute.

A "caretaker" is "[a]ny person other than a parent, guardian, or custodian who has responsibility for the health and welfare of a juvenile *in a residential setting*." N.C. Gen. Stat. § 7B-101(3) (2021) (emphasis added). Our Supreme Court has explained what that means:

> The "caretaker" statute protects children from abuse and

neglect inflicted by people with significant, parental-type responsibility for the daily care of a child in the child's residential setting. Stepparents, foster parents, and adult members of the juvenile's household, for example, live with the child in the child's home. Similarly, house parents or cottage parents are in charge of children in nontraditional residential settings, such as dormitories or group residences, where children live for extended periods of time. . . . "[A]n adult relative entrusted with the juvenile's care" is a person who has a significant degree of parental-type responsibility for the child.

*In re R.R.N.*, 368 N.C. 167, 170, 775 S.E.2d 656, 659 (2015) (citations omitted).

Defendant doesn't fit this definition. He did not reside with Ann, did not have parental-type responsibility for her daily care, and did not supervise her in a residential setting. He was responsible for Ann's health and welfare during a ride-along as the supervising officer for the Police Explorers program. A ride-along is not a "residential setting."

Without evidence of a parent, guardian, custodian, or caretaker who created or allowed the substantial risk of serious physical injury, the State failed to prove that Ann could be adjudicated abused under Section 7B-101(1)(b). *See Stevens*, 228 N.C. App. at 356, 745 S.E.2d at 67. And without that showing, the State cannot establish that Defendant "cause[d], encourage[d], or aid[ed]" Ann "to be in a place or condition, or to commit an act whereby [she] could be adjudicated . . . abused." N.C. Gen. Stat. § 14-316.1.

The State resists this conclusion, relying on this Court's decision in *State v. Harris*, 236 N.C. App. 388, 763 S.E.2d 302 (2014). In its view, *Harris* requires only

that Defendant put Ann in a situation where she did "not receive proper care from a caretaker" or was "not provided necessary medical care." *Id.* at 394, 763 S.E.2d at 308 (quoting *Stevens*, 228 N.C. App. at 355, 745 S.E.2d at 67). Defendant's conduct did exactly that, the State says—"it placed [Ann] in a situation where she was deprived of appropriate care by a caretaker." The State implies that Defendant was a caretaker, since there's no evidence anyone else could have been. But as we have explained, Defendant was not a caretaker under Section 7B-101(3).

And *Harris* doesn't help the State for another reason. The defendant there was charged under Section 14-316.1 with contributing to "the abuse or neglect" of a juvenile. *Id.* at 389, 763 S.E.2d at 305. He was at the juvenile's grandmother's home, entered a bedroom where the juvenile was sleeping, touched her inappropriately, and tried to give her alcohol. *Id.* at 394-95, 763 S.E.2d at 308. We concluded that the defendant's conduct "placed [the juvenile] in a location in which and subject to conditions under which she could not and did not receive proper care from her caretakers." *Id.* at 395, 763 S.E.2d at 308.

That conclusion relied on Section 7B-101(15)(a)'s definition of a "neglected juvenile"—one "whose parent, guardian, custodian, or caretaker" "[d]oes not provide proper care, supervision, or discipline." N.C. Gen. Stat. § 7B-101(15)(a) (2021). Under that definition, the caretaker's neglect allows the child not to receive proper care or supervision. The defendant's conduct alone can prevent the juvenile from receiving proper care, violating Section 14-316.1.

But Section 7B-101(1)(b)'s abuse definition works differently. It requires that the juvenile's "parent, guardian, custodian, or caretaker" create or allow the "substantial risk of serious physical injury." N.C. Gen. Stat. § 7B-101(1)(b). To violate Section 14-316.1 under that definition, the parent, guardian, custodian, or caretaker must act—or allow another person to act—in a way that creates a "substantial risk of serious physical injury." Defendant could not "contribute" to an act of Ann's "parent, guardian, custodian, or caretaker" creating or allowing a "substantial risk of serious physical injury" where there is no evidence that any of these people were involved.

In short, the State presented no substantial evidence that Defendant "caused, encouraged, or aided [Ann] to commit an act or to be in a place or condition whereby [she] could be adjudicated abused" under Section 7B-101(1)(b). There is no evidence that Defendant communicated with Ann's parents before the tasing or that her parents knew or had reason to know Defendant may intentionally expose Ann to a risk of serious physical injury. We therefore vacate Defendant's Section 14-316.1 conviction.

## B. Willfully Failing to Discharge Duties

Section 14-230 makes it a Class 1 misdemeanor for "any . . . sheriff" to "willfully omit, neglect[,] or refuse to discharge any of the duties of his office." N.C. Gen. Stat. § 14-230(a). The trial court instructed the jury that the State had to prove Defendant "omitted, neglected, or refused to discharge a duty of his office, enforcing

the criminal laws of this State, by encouraging a juvenile to use an Avery County taser on herself." Defendant argues that the evidence shows no such omission, neglect, or refusal.

The State disagrees. It contends that Defendant violated Section 14-230 by failing to enforce Section 14-316.1—the law prohibiting contributing to the abuse of a juvenile. Because his "conduct contributed to the abuse of the victim," the State concludes, "he willfully failed to carry out his duty to enforce the law." We disagree.

To convict under Section 14-230, the State must prove three elements. First, the defendant must be "an official of a state institution, rather than a state employee." *State v. Eastman*, 113 N.C. App. 347, 350, 438 S.E.2d 460, 462 (1994). Second, the defendant must "willfully omit[,] neglect[,] or refuse[ ] to discharge the duties of his office." *Id.* And third, an "injury to the public" must occur because of that "omission, neglect[,] or refusal." *State v. Rhome*, 120 N.C. App. 278, 293-94, 462 S.E.2d 656, 667 (1995) (citing *State v. Anderson,* 196 N.C. 771, 773, 147 S.E. 305, 306 (1929)).

The State failed to present substantial evidence of the second element. We begin with Section 14-230's text. *See Fearrington v. City of Greenville*, 386 N.C. 38, 52, 900 S.E.2d 851, 865-66 (2024) ("We first look to the [statute's] plain language, as the 'actual words of the legislature are the clearest manifestation of its intent.'" (citation omitted)). "Omit," "neglect," and "refuse," as used in Section 14-230, all describe the same thing: failing to act when circumstances call for action. To "omit" means to "fail or neglect to do (something); leave undone." *Omit*, Oxford American

- 12 -

Dictionary (3rd ed. 2010). To "neglect" means to "fail[ ] to do something." *Neglect*, Oxford American Dictionary (3rd ed. 2010). And to "refuse" means to "indicate or show that one is not willing to do something" or to "fail to perform a required action." *Refuse*, Oxford American Dictionary (3rd ed. 2010). None describes actively committing an unlawful act. Our cases applying Section 14-230 bear this out.

In *State v. Stanley*, two officers stopped a vehicle and discovered contraband, weapons, drugs, and alcohol. 60 N.C. App. 568-69, 299 S.E.2d 464, 465 (1983). One officer announced he was arresting the suspects. *Id.* at 569, 299 S.E.2d at 465. But instead, both officers took the suspects' weapons for themselves and let them go without charges. *Id.* One of the officers was convicted of bribery for taking the weapon and Section 14-230 for failing to arrest the suspects. *Id.* at 568, 299 S.E.2d at 465. The discovery of contraband, the Court said, triggered a duty to arrest—a duty the defendant "had the authority" to perform but declined to do. *Id.* at 571, 299 S.E.2d at 466. We held that the evidence supported his conviction for "willfully failing to discharge the duties of his office as a policeman." *Id.* at 568, 570-71, 299 S.E.2d at 465, 466.

Earlier Section 14-230 cases reflect the same basic scenario: external circumstances trigger a duty, and the officer declines to act. *See, e.g., State v. Furguson*, 76 N.C. 197, 198 (1877) (affirming a conviction where the constable received a warrant directing him to arrest an individual but he willfully failed to execute it); *State v. Hord*, 264 N.C. 149, 152, 141 S.E.2d 241, 243 (1965) (upholding

indictments alleging the police chief knew of ongoing prostitution at a specific address but willfully omitted to investigate and bring the operator to prosecution). That is what "omit," "neglect," and "refuse" mean in Section 14-230.

Here, the State identifies no such external circumstances. Unlike *Stanley*, where discovering contraband created a duty to arrest, Ann faced no risk until Defendant created it. No complaint triggered a duty to investigate. No crime was reported. And no probable cause arose.

Still, the State claims that Defendant failed to enforce Section 14-316.1 by violating it. We have already determined that Defendant didn't violate Section 14.316.1. But even if he had, Section 14-230 doesn't criminalize violating laws; it criminalizes omitting, neglecting, or refusing to perform required duties. The State cannot point to any specific duty Defendant failed to perform. Encouraging a juvenile to tase herself is acting—Defendant did something, not nothing.

And the State cites no case where an officer was convicted under Section 14-230 on the theory that violating a law constitutes failing to enforce it. On that reasoning, any officer who violates a criminal statute could also be charged with willfully failing to discharge his duties simply because he committed a crime. Nothing in Section 14-230 supports that reading.

In sum, the State presented no substantial evidence that Defendant "omitted, neglected, or refused to discharge a duty of his office, enforcing the criminal laws of this State, by encouraging a juvenile to use an Avery County taser on herself." We

therefore vacate Defendant's Section 14-230 conviction.

### III.    Conclusion

For the reasons explained above, we hold that the trial court erred in denying Defendant's motions to dismiss.  We thus vacate both convictions.

VACATED.

Judges HAMPSON and GORE concur.