IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-787

Filed 7 November 2023

Haywood County, Nos. 18CRS053666, 19CRS000293-95, 19CRS000314, 19CRS000316, 18CRS053662, 19CRS000326-28

STATE OF NORTH CAROLINA

v.

DESJAUN MONTRE CLAWSON, OMAR SIRREE JACKSON, and DAMARCUS JEREMALE WIGGINS

Appeal by Defendants from judgments entered 31 August 2021 by Judge Bradley B. Letts in Haywood County Superior Court. Heard in the Court of Appeals 3 October 2023.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Nicholas R. Sanders, for the State.*
>
> *Grace, Tisdale & Clifton, P.A., by Michael A. Grace and Christopher R. Clifton, for Defendant Desjaun Montre Clawson; Anne Bleyman for Defendant Omar Sirree Jackson; and Gammon, Howard & Zeszotarski, PLLC, by Joseph E. Zeszotarski, Jr., for Defendant Demarcus Jeremale Wiggins.*

COLLINS, Judge.

Desjaun Montre Clawson, Damarcus Jeremale Wiggins, and Omar Sirree Jackson (collectively, "Defendants") appeal from the trial court's judgments entered upon guilty verdicts of various drug-related offenses. Defendants argue that the trial court erred by allowing the State's motion to join Defendants' cases for trial. Wiggins argues that the trial court erred by admitting certain testimony at trial. Clawson

and Wiggins each argue that the trial court erred by denying their motions to dismiss trafficking in opium or heroin and trafficking in cocaine charges. Finally, Defendants each argue that the trial court erred by denying their motions to dismiss conspiracy to traffic in opium or heroin and conspiracy to traffic in cocaine charges. We find no error.

## I. Background

The evidence at trial tended to show the following: On 18 October 2018, Detective Matthew Rinehardt with the Haywood County Sheriff's Department received an anonymous phone call alleging that there was drug activity at the Olive View Apartments. The apartment building was formerly a motel which had been converted into efficiency apartments. Rinehardt was familiar with the apartments because there had been numerous complaints concerning "narcotics, people with warrants, things like that."

Rinehardt relayed this information to Detective Jordan Reagan, and Reagan went to the apartments and "put eyes on to start watching and seeing if there was any activity moving, any vehicles coming and going, or anything that we could act on." Reagan parked his unmarked patrol vehicle about one-tenth of a mile away from the apartments and used binoculars to observe the property. While conducting surveillance, Reagan observed a black Dodge Charger parked in front of the apartments. The Charger had a silver "swoop that follows the contour of the body." Reagan was familiar with the vehicle as it had been the subject of previous complaints

and was being watched for "possibly being involved in narcotics[.]" Rinehardt had seen Wiggins operating the vehicle on multiple occasions.

Reagan also observed traffic in and out of the last two apartments, Rooms 14 and 15. Several vehicles would pull up, "[s]ometimes just one person would get out" and "[t]he driver would stay in the vehicle[,]" and "[t]he person would meet with people at the apartments, stay for a minute or go inside the apartment and leave[.]" On two occasions, Reagan witnessed "two black males come out of Apartment 14 and walk into 15, stay for a couple minutes, [and] come back out." One of the black males had a "tall, skinnier-type build with dreads, and the other black male was short and heavier set, short hair and had a bright pair of pants."

Reagan called officers from the criminal suppression unit for assistance. Several officers began conducting traffic stops of vehicles exiting the apartments based on information from Reagan, including "occupants of the vehicle, description of the vehicle, make, model, color, and the direction of travel." At some point, Reagan observed a female leave Room 14, get into the black Charger, and drive out of the parking lot. An officer conducted a traffic stop of the vehicle near the Dollar General, and Reagan arrived on the scene for backup. Upon searching the vehicle, the officer discovered a mirror with a white powdery residue and a needle.

Based upon the information gathered, search warrants were issued for Rooms 14 and 15, and separate teams of law enforcement conducted the searches simultaneously. Room 15 was unoccupied, but the bed was "askew as if someone had

been in it[.]" Rinehardt requested a K-9 search of the room, and the K-9 alerted to the dresser. In the top drawer of the dresser, a Bojangles bag was found containing 58.4 grams of a gray chalky substance, 27.2 grams of a tan rock substance, 37.2 grams of a white powdery substance, and two digital scales, which "are used to take quantities of drug and break them down into a smaller quantity." The substances found in the Bojangles bag were chemically analyzed; the gray chalky substance was determined to be a heroin and fentanyl mixture, the tan rock substance was determined to be cocaine base, and the white powdery substance was determined to be cocaine hydrochloride.[1]

Room 14 was occupied by Clawson, Jackson, Wiggins, and Craig Hambrick, and they were sitting in the living area smoking a joint. The officers detained the four men and patted them down for weapons. Rinehardt patted Wiggins down and found $2,175 in his front pants pocket. The cash was not consistently folded or in a single stack, but rather was "in a wad" and "kind of all jumbled up in his pocket." Another officer patted Clawson down and found a total of $5,330 on his person.

Plastic bags containing 3.3 grams of a gray chalky substance and .9 grams of a tan rock substance were found on the floor of Room 14. The substances were chemically analyzed; the gray chalky substance was determined to be a heroin and fentanyl mixture and the tan rock substance was determined to be cocaine base. A

---

[1] Cocaine base is "sometimes called crack cocaine[,]" whereas cocaine hydrochloride is "a salt form" and is "more powdery, and it will dissolve more readily in water than cocaine base will."

document appearing to be a rental application for the Olive View Apartments was found in the kitchenette area. Jackson's name and driver's license number appeared at the top of the document, and "a signature that appeared to be consistent with the name Omar Jackson" appeared at the bottom of the document. The rental application was dated 18 October 2018, the same day the search warrants were executed. A key to Room 15 was found next to the rental application.

The following items were also found in Room 14: multiple Bojangles bags, boxes, and cups throughout the room; a rolled-up dollar bill on the futon; a lighter and tin foil on the floor near the futon; a hide-a-can in the kitchenette area, which "has the actual identical weight, label, and look of a soda can, but if you twist the top, the top actually breaks off . . . [a]nd then there is a hollow portion on the inside where things can be hidden"; two razor blades with a white powdery residue in the kitchenette area; a large plastic bag containing smaller plastic bags in the kitchenette area; a Pyrex dish containing a butter knife, tongs, and "crystal substance and residue in the bottom" in the kitchenette area; a safe with the word "dope" written on it containing Narcan kits[2] in the bedroom; and a black Coach bag containing Wiggins' identification card in the bedroom.

---

[2] A Narcan kit is "either given nasally or through an injection to reverse the effects of an overdose on heroin or opiates[.]"

Defendants were indicted for trafficking in opium or heroin, conspiracy to traffic in opium or heroin, trafficking in cocaine, and conspiracy to traffic in cocaine.[3] The matter came on for trial on 23 August 2021. The State moved to join Defendants' cases for trial, and the trial court allowed the State's motion over Defendants' objections.[4] At the close of the State's evidence, Defendants moved to dismiss the charges for insufficient evidence. The trial court denied the motions.

The jury returned guilty verdicts on all charges against Clawson; the trial court consolidated the convictions and sentenced him to 225 to 282 months of imprisonment. The jury returned guilty verdicts on all charges against Wiggins. The trial court consolidated Wiggins' convictions for trafficking in opium or heroin and conspiracy to traffic in opium or heroin and sentenced him to 225 to 282 months of imprisonment; the trial court consolidated Wiggins' convictions for trafficking in cocaine and conspiracy to traffic in cocaine into a separate judgment and sentenced him to a consecutive term of 35 to 51 months of imprisonment. The jury returned not guilty verdicts on the trafficking charges and guilty verdicts on the conspiracy charges against Jackson; the trial court consolidated the convictions and sentenced him to 225 to 282 months of imprisonment. Defendants appealed.

---

[3] Jackson was also indicted for two counts of maintaining a dwelling for the purpose of keeping or selling controlled substances, but the State dismissed these charges prior to trial.

[4] Hambrick was also indicted for trafficking in opium or heroin, conspiracy to traffic in opium or heroin, trafficking in cocaine, and conspiracy to traffic in cocaine. The State initially included Hambrick in its motion for joinder. However, Hambrick was tried separately from Defendants and is not a party to this appeal.

## II. Discussion

### A. State's Motion for Joinder

Defendants first argue that the trial court erred by allowing the State's motion to join Defendants' cases for trial.

Under N.C. Gen. Stat. § 15A-926(b)(2)(a), charges against two or more defendants may be joined for trial where "each of the defendants is charged with accountability for each offense[.]" N.C. Gen. Stat. § 15A-926(b)(2)(a) (2021). However, section 15A-927(c)(2)(a) requires the trial court to deny a motion for joinder "[i]f before trial . . . it is found necessary to promote a fair determination of the guilt or innocence of one or more defendants[.]" *Id.* § 15A-927(c)(2)(a) (2021). "Even though the defendants in a joint trial may offer antagonistic or conflicting defenses, that fact alone does not necessarily warrant severance. The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial." *State v. Lowery*, 318 N.C. 54, 59, 347 S.E.2d 729, 734 (1986) (quotation marks and citations omitted).

"Whether defendants should be tried jointly or separately pursuant to these provisions is a matter addressed to the sound discretion of the trial judge." *State v. Rasor*, 319 N.C. 577, 581, 356 S.E.2d 328, 331 (1987) (citation omitted). "Absent a showing that defendant has been deprived of a fair trial by joinder, the trial judge's discretionary ruling on the question will not be disturbed on appeal." *Id.* (citation omitted).

Here, Defendants were indicted for trafficking in opium or heroin, conspiracy to traffic in opium or heroin, trafficking in cocaine, and conspiracy to traffic in cocaine stemming from the same incident on 18 October 2018. There were "no statements or confessions which [the State] intend[ed] to offer at this trial," and there were "no affirmative defenses such as alibi or other matters which might impact the ability of the defendants to be joined at this trial." Because there were no antagonistic or conflicting defenses that would deprive Defendants of a fair trial, the trial court did not err by allowing the State's motion to join Defendants' cases.

## B. Admission of Certain Evidence and Testimony

Wiggins argues that the trial court erred by admitting testimony that law enforcement had seen him operating the black Charger on multiple occasions, that the vehicle had been the subject of previous complaints, and that the vehicle was being watched for possibly being involved in narcotics.[5]

"The standard of review for admission of evidence over objection is whether it was admissible as a matter of law, and if so, whether the trial court abused its discretion in admitting the evidence." *State v. Gayles*, 233 N.C. App. 173, 176, 756 S.E.2d 46, 48 (2014). An abuse of discretion results where the court's ruling is

---

[5] Within Clawson's argument that the trial court erred by denying his motion to dismiss, he asserts that the trial court erred by admitting "evidence of [the] monies found in Clawson's pocket at the time of the bust" and by admitting testimony regarding the anonymous phone call. However, Clawson failed to cite any supporting authority for these assertions and any argument is thus deemed abandoned. N.C. R. App. P. 28(b)(6).

manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. *Id.*

Hearsay is a statement other than one made by the declarant while testifying at trial that is offered in evidence to prove the truth of the matter asserted. N.C. Gen. Stat. § 8C-1, Rule 801. "Out-of-court statements that are offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Gainey*, 355 N.C. 73, 87, 558 S.E.2d 463, 473 (2002) (citation omitted). "Specifically, statements are not hearsay if they are made to explain the subsequent conduct of the person to whom the statement was directed." *Id.*

Here, Rinehardt testified as follows:

> [RINEHARDT]: The black Dodge Charger was known to me. We had gotten previous complaints on it, and I had --
>
> . . . .
>
> [RINEHARDT]: And I had been following it and conducting surveillance on the Olive View Apartments prior to this date.
>
> [THE STATE]: Okay. Were you familiar with this vehicle?
>
> [RINEHARDT]: I was.
>
> . . . .
>
> [THE STATE]: And do you have personal knowledge of who the operator of that vehicle was at a relevant time to this investigation?
>
> [RINEHARDT]: I do.
>
> [THE STATE]: And how do you have that knowledge?
>
> [RINEHARDT]: I observed Mr. Wiggins driving the black Dodge Charger.
>
> [THE STATE]: Okay. And was that here in our

community?

[RINEHARDT]:  Yes, sir.

[THE STATE]:  And was that on one time or more than one time?

[RINEHARDT]:  More than one time.

Rinehardt testified that he had personal knowledge of the black Charger and that he had seen Wiggins operating the vehicle on multiple occasions.  As these statements were based on Rinehardt's personal knowledge, they were not hearsay.  Furthermore, his statement that "[w]e had gotten previous complaints on it" was not offered for the truth of the matter asserted, but instead was offered to explain his subsequent surveillance of the Charger; accordingly, it was not hearsay.  *See id.*

Furthermore, Reagan testified as follows:

> [THE STATE]: . . . Do you recognize the building or any vehicles depicted in State's Exhibit 2?
>
> [REAGAN]:  Yes, sir.  This is the Olive View Apartments, and that's the black Dodge Charger sitting in front of it.
>
> . . . .
>
> [THE STATE]:  Were you familiar with that vehicle?
>
> [REAGAN]:  Yes, sir.
>
> [THE STATE]:  How were you familiar with that vehicle?
>
> [REAGAN]:  Just from other officers advising me of that vehicle and who had been riding around in it.
>
> [THE STATE]:  I understand.  So officers generally share information with each other?
>
> [REAGAN]:  Yes, sir.
>
> [THE STATE]:  That was a vehicle that was being watched?

> [REAGAN]:  Yes, sir.
> [THE STATE]:  By your agency?
> [REAGAN]:  Yes, sir.
> . . . .
> [THE STATE]:  Why were y'all watching that vehicle?
> [REAGAN]:  For possibly being involved in narcotics --

Reagan's statements were not hearsay because they were offered to explain his subsequent conduct.  *See id.*  After Reagan observed the black Charger and traffic in and out of Rooms 14 and 15, he "contacted Sergeant Mark Mease . . . on [the] criminal suppression unit with Haywood County . . . , advised him of what [he] had been watching and observing, and they came and set up in marked patrol cars and started conducting traffic stops on vehicles leaving this area."  As these statements were offered to explain Reagan's subsequent conduct, they were not hearsay.

Accordingly, as the challenged statements were not hearsay, the trial court did not err by admitting the testimony.

## C. Motion to Dismiss

Defendants each argue that the trial court erred by denying their motion to dismiss at the close of the State's evidence.  Specifically, Clawson and Wiggins argue that the trial court erred by denying their motions to dismiss the charges of trafficking in opium or heroin and trafficking in cocaine, and Defendants each argue that the trial court erred by denying their motion to dismiss the charges of conspiracy to traffic in opium or heroin and conspiracy to traffic in cocaine.

We review a trial court's denial of a motion to dismiss de novo. *State v. Chavis*, 278 N.C. App. 482, 485, 863 S.E.2d 225, 228 (2021). "In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Chekanow,* 370 N.C. 488, 492, 809 S.E.2d 546, 549 (2018) (quotation marks and citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Rivera*, 216 N.C. App. 566, 568, 716 S.E.2d 859, 860 (2011) (quotation marks and citation omitted).

"In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *Chekanow*, 370 N.C. at 492, 809 S.E.2d at 549-50 (quotation marks and citation omitted). Any contradictions or discrepancies in the evidence are for the jury to decide. *State v. Wynn*, 276 N.C. App. 411, 416, 856 S.E.2d 919, 923 (2021).

### 1. *Trafficking in Opium or Heroin and Trafficking in Cocaine*

Clawson and Wiggins were convicted of trafficking in opium or heroin and trafficking in cocaine.

Under North Carolina law, "[a]ny person who sells, manufactures, delivers, transports, or possesses four grams or more of opium, . . . including heroin, or any mixture containing such substance, shall be guilty of a felony which felony shall be

known as 'trafficking in opium, opiate, opioid, or heroin[.]'" N.C. Gen. Stat. § 90-95(h)(4) (2021). Furthermore, "[a]ny person who sells, manufactures, delivers, transports, or possesses 28 grams or more of cocaine . . . shall be guilty of a felony, which felony shall be known as 'trafficking in cocaine[.]'" N.C. Gen. Stat. § 90-95(h)(3) (2021).

Possession of a controlled substance may be either actual or constructive. *State v. Nettles*, 170 N.C. App. 100, 103, 612 S.E.2d 172, 174 (2005). "A person has actual possession of a substance if it is on his person, he is aware of its presence, and either by himself or together with others he has the power and intent to control its disposition or use." *State v. Ferguson*, 204 N.C. App. 451, 459, 694 S.E.2d 470, 477 (2010) (quotation marks and citations omitted). "Constructive possession occurs when a person lacks actual physical possession, but nonetheless has the intent and power to maintain control over the disposition and use of the substance." *State v. Acolatse*, 158 N.C. App. 485, 488, 581 S.E.2d 807, 810 (2003) (quotation marks and citation omitted).

"Constructive possession depends on the totality of the circumstances in each case." *State v. Taylor*, 203 N.C. App. 448, 459, 691 S.E.2d 755, 764 (2010) (citation omitted). "Unless a defendant has exclusive possession of the place where the contraband is found, the State must show other incriminating circumstances sufficient for the jury to find a defendant had constructive possession." *State v. Miller*, 363 N.C. 96, 99, 678 S.E.2d 592, 594 (2009) (citation omitted). When

determining whether other incriminating circumstances exist to support a finding of constructive possession, we consider, among other things: (1) "the defendant's ownership and occupation of the property"; (2) "the defendant's proximity to the contraband"; (3) "indicia of the defendant's control over the place where the contraband is found"; (4) "the defendant's suspicious behavior at or near the time of the contraband's discovery"; and (5) "other evidence found in the defendant's possession that links the defendant to the contraband." *Chekanow*, 370 N.C. at 496, 809 S.E.2d at 552 (citations omitted).

Because neither Clawson nor Wiggins had exclusive possession of Room 15 where the substances were found, the State was required to show other incriminating circumstances sufficient for the jury to find that each defendant constructively possessed the contraband. *Miller*, 363 N.C. at 99, 678 S.E.2d at 594.

### a. Room 15

A Bojangles bag containing 58.4 grams of a gray chalky substance, 27.2 grams of a tan rock substance, 37.2 grams of a white powdery substance, and two digital scales were found in the top drawer of a dresser in Room 15. The substances were chemically analyzed; the gray chalky substance was determined to be a heroin and fentanyl mixture, the tan rock substance was determined to be cocaine base, and the white powdery substance was determined to be cocaine hydrochloride.

### b. Room 14

Clawson, Jackson, Wiggins, and Hambrick occupied Room 14. Bojangles bags,

boxes, and cups were found throughout the room. Plastic bags containing 3.3 grams of a gray chalky substance and .9 grams of a tan rock substance were found on the floor. The substances were chemically analyzed; the gray chalky substance was determined to be a heroin and fentanyl mixture and the tan rock substance was determined to be cocaine base.

### c. *Clawson's Person*

After Clawson was detained, an officer conducted a pat down and found $5,330 on his person.

### d. *Wiggins' Person*

Rinehardt conducted a pat down of Wiggins and found $2,175 in his front pants pocket. The cash was not consistently folded or in a single stack, but rather was "in a wad" and "kind of all jumbled up in his pocket." Furthermore, a black Coach bag containing Wiggins' identification card was found in the bedroom of Room 14.

The Bojangles bags found in both Rooms 14 and 15; the gray chalky substance that was determined to be a heroin and fentanyl mixture found in both Rooms 14 and 15; the tan rock substance that was determined to be cocaine base found in both Rooms 14 and 15; and the large amount of cash found on Clawson's person was sufficient evidence of other incriminating circumstances from which the jury could find that Clawson constructively possessed the contraband found in Room 15. Likewise, the Bojangles bags found in both Rooms 14 and 15; the gray chalky substance that was determined to be a heroin and fentanyl mixture found in both

Rooms 14 and 15; the tan rock substance that was determined to be cocaine base found in both Rooms 14 and 15; and the large amount of cash found on Wiggins' person was sufficient evidence of other incriminating circumstances from which the jury could find that Wiggins constructively possessed the contraband found in Room 15.

Accordingly, the trial court did not err by denying Clawson's and Wiggins' motions to dismiss the trafficking in opium or heroin and trafficking in cocaine charges.

### 2. *Conspiracy to Traffic in Opium or Heroin and Conspiracy to Traffic in Cocaine*

Defendants were convicted of conspiracy to traffic in opium or heroin and conspiracy to traffic in cocaine.

"A criminal conspiracy is an agreement between two or more people to do an unlawful act or to do a lawful act in an unlawful manner. In order to prove conspiracy, the State need not prove an express agreement; evidence tending to show a mutual, implied understanding will suffice." *State v. Winkler*, 368 N.C. 572, 575, 780 S.E.2d 824, 826-27 (2015) (quotation marks and citation omitted). "This evidence may be circumstantial or inferred from the defendant's behavior." *State v. Shelly*, 176 N.C. App. 575, 586, 627 S.E.2d 287, 296 (2006) (citation omitted). "The crime of conspiracy does not require an overt act for its completion; the agreement itself is the crime." *Id.* "Proof of a conspiracy is generally established by a number of indefinite

acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Jenkins*, 167 N.C. App. 696, 700, 606 S.E.2d 430, 433 (2005) (quotation marks, brackets, and citation omitted).

To convict Defendants of conspiracy to traffic in opium or heroin, the State was required to prove that Defendants entered into an agreement to possess four grams or more of opium, including heroin, or any mixture containing such substance. N.C. Gen. Stat. § 90-95(h)(4). Furthermore, to convict Defendants of conspiracy to traffic in cocaine, the State was required to prove that Defendants entered into an agreement to possess 28 grams or more of cocaine. N.C. Gen. Stat. § 90-95(h)(3).

In addition to the above evidence of Clawson's and Wiggins' constructive possession of the contraband found in Room 15, a document appearing to be a rental application for the Olive View Apartments was found in the kitchenette area of Room 14. Jackson's name and driver's license number appeared at the top of the document, and "a signature that appeared to be consistent with the name Omar Jackson" appeared at the bottom of the document. The rental application was dated 18 October 2018, the same day the search warrants were executed. A key to Room 15 was found next to the rental application. This evidence, when taken collectively, was sufficient to establish that Defendants entered into an agreement to traffic in opium or heroin and to traffic in cocaine.

Accordingly, the trial court did not err by denying Defendants' motions to

dismiss the conspiracy to traffic in opium or heroin and conspiracy to traffic in cocaine charges.

### III.    Conclusion

The trial court did not err by allowing the State's motion to join Defendants' cases for trial.  Furthermore, the trial court did not err by admitting certain testimony at trial.  Finally, the trial court did not err by denying Defendants' motions to dismiss. Accordingly, we find no error.

NO ERROR.

Judges GRIFFIN and THOMPSON concur.