An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-334

Filed 3 December 2025

Buncombe County, Nos. 22CR084628-100, 22CR084436-100

STATE OF NORTH CAROLINA

v.

BART WILLIAM ZINK, Defendant.

Appeal by Defendant from judgment entered 11 July 2024 by Judge Alan Z. Thornburg in Buncombe County Superior Court. Heard in the Court of Appeals 23 September 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Tanner J. Ray, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender David S. Hallen, for Defendant.*

GRIFFIN, Judge.

Defendant argues the trial court erred in denying his motion to dismiss his felony secret peeping charge because the State failed to present substantial evidence that he filmed the victim "secret or surreptitiously," a necessary element of the charge. We disagree and find no error.

### I.    Factual and Procedural Background

On 20 May 2022, T.B. went to Defendant's house in West Asheville in Buncombe County for "a party, get-together." T.B. testified she had a "[v]ery vague" relationship with Defendant, as she met him through playing pool and a mutual friend. She further testified that at 9:00 PM Defendant called and invited her to the party that same night. Defendant listed several of her friends when inviting her to the party "to play music, maybe have a bonfire, and it's great that we have so many mutual friends that we can all associate with each other together." T.B. showed up at Defendant's house sometime after 10:00 PM with a six-pack of "Juicy Haze IPA" stout beer, containing alcohol content level of over 9%. T.B. was the only guest at Defendant's house when she arrived.

T.B. testified when she entered Defendant's house, Defendant pushed her "to smoke a joint that he rolled that he said that was particularly for [her]." T.B. eventually "sparked" it but set it down. T.B. testified that she had taken cyclobenzaprine, a prescribed muscle relaxer, at 6:00 or 7:00 PM that evening. During her initial time in Defendant's house, T.B. began drinking her first beer while Defendant showed her various items. T.B. testified she visited the bathroom, and, upon exiting saw Defendant holding her beer. When T.B. questioned him, Defendant responded, "you're not drinking fast enough. Let's finish this and have another one, and let's hang out." T.B. had another beer and one shot of whiskey "from an airplane bottle," all of which T.B. testified Defendant saw her drink. T.B. testified that, in sum, she had at least two beers, one shot of whiskey, and had inhaled some marijuana

on top of her muscle relaxer prescription.

No one else came to Defendant's house during this time, and T.B. told Defendant "multiple times" she was ready to go home. However, Defendant would request they "play another set" of music and "have another beer." T.B. stayed and played guitar. T.B. testified she and Defendant "stayed pretty far away from each other the entire night," but at one point after she finished playing a set, Defendant tried to give T.B. a high-five. T.B. declined saying, "I'm not an affectionate person, and I don't do high-fives." After a few hours at Defendant's house, T.B. was not feeling well and, according to her testimony, was told by Defendant she seemed "a little intoxicated." T.B. testified the last thing she remembered was her saying to Defendant, "I'm going to sit down for 15 minutes, and then I am going home." T.B. laid down on Defendant's reclining chair.

When T.B. woke up she was in Defendant's bed, and, as she testified, Defendant was behind her whispering "[y]ou're a rock star with a rockin' body" and masturbating. Upon T.B.'s questioning Defendant about what he was saying, how she ended up in his bed, and how long he had been in there, he jumped off the bed, appearing "sweaty and red," and said, "[o]h, no. I just -- I just came and laid down for a second. You just -- you just passed out and fell asleep. Everything is fine." T.B. testified that she heard "something electronic" during the night, "[l]ike, when you take a picture, the snap," but did not know at the time and did not suspect Defendant had taken a photo at that time.

T.B. then left Defendant's house but testified that the sound she had heard was bothering her, so she returned to Defendant's house to see his phone. When she returned Defendant was on the phone with his brother, and T.B. pretended she wanted to speak to Defendant's brother. T.B. put the brother on speakerphone and went through Defendant's picture gallery. T.B. found what she believed to be a photo of herself on Defendant's phone, identifying the shirt she was wearing and her custom tattoo, sent the photo to her phone, and deleted the photo from his phone. T.B. left Defendant's house and returned to her own home, where she realized what she thought was the photo from Defendant's phone, which she now had on her phone, was a video. T.B. testified she had never been in Defendant's room prior and, upon playing the video, recognized the bedding in the video as Defendant's bedding, the checkered shorts as the shorts Defendant was wearing that night, and herself. The video depicted Defendant exposing and fondling T.B.'s nipples and manipulating T.B.'s hand to masturbate himself. T.B. testified she never gave Defendant permission for the actions in the video, nor did she remember them happening.

T.B. confronted Defendant about the video in a series of messages, with Defendant saying he did not "remember the evening hours from 1[:00 A.M.]" On the afternoon of 22 May 2022, T.B. reported the crime and video to police. On 13 July 2022, T.B. received a voicemail from Defendant saying, he "did ruin [his] life that day," left town when T.B. threatened him, "wish[ed] [they] could resolve[] something," "perhaps [they] could come up with monetary compensation for [her] to try to put it

- 4 -

behind [them] both," and was "very sad that [he] hurt [T.B.] and [his] family and [his] friends."

Defendant was arrested in Michigan on 18 August 2022 and transported to North Carolina in mid-September of 2022. On 1 May 2023, Defendant was indicted on a charge of sexual battery in file number 22CRS084436-100 and, upon a superseding indictment, was indicted for a charge of felony secret peeping on 28 August 2023 in file number 22CRS084628-100, the conviction on appeal to this Court.

At trial, the State called a forensic toxicologist, Paul Glover, as an expert witness. Mr. Glover produced a report for this case, entered as State's Exhibit 15, based on documentation received from the State. The report offered his opinion that T.B.'s blood alcohol content ("BAC") "from midnight onward would have been significant with respect to its impairing effects" and T.B. "would have been mentally incapacitated and[/]or physically helpless to the contact in this case due to the ingested substances." Mr. Glover based his report on factors including T.B.'s age, weight, her prescription muscle relaxer she had been taking for five days, three 12-ounce beers with 9.5% alcohol, a 1.6-ounce bottle of bourbon at 40% alcohol, and THC consumed from the joint, calculating a range BAC level for T.B. based on a time range from 11:00 P.M. to 2:00 A.M. Mr. Glover calculated a peak BAC of .21 at 11:00 P.M. and a BAC of .16 three hours later at 2:00 A.M. Mr. Glover testified that if T.B. drank two beers the peak BAC would then be .11. Mr. Glover then testified about alcohol's role as a depressant of the central nervous system ("CNS"), stating a BAC between

.11 and .16 would start to elicit more overt signs of impairment—"more staggering, more problems with divided attention tasks, like driving, things of that nature."

Turning his testimony to marijuana, Mr. Glover testified marijuana causes individuals to "experience distortion of time and space" and to "lose their ability to concentrate on things." He continued, "[w]hen it's added to a person who has another CNS depressant on board, it exacerbates those CNS depressant characteristics. So they may be more drowsy. They may be more – more compromised with the ability to concentrate." Mr. Glover further testified that marijuana and alcohol can inhibit memories and both cause drowsiness, with marijuana "enhanc[ing] the drowsiness that you feel from any other CNS depressant."

Regarding T.B.'s muscle relaxer prescription, cyclobenzaprine, Mr. Glover testified it had a half-life, the amount of time it takes the body to eliminate half of what it took, of 20 hours, which leads to "increasing concentrations" of the muscle relaxer remaining in the system over a period of days. According to Mr. Glover's testimony, with cyclobenzaprine "you get some of the same effects you see with other CNS depressants" such as drowsiness and "inability to concentrate," and "if it's added to other CNS depressants, you get an added effect. So the more . . . CNS depressants you mix together, the greater the effect."

Mr. Glover was then questioned about the video at issue:

Q. Have you reviewed the video evidence in this case?

A. I did.

Q. Are there signs of impairment that you saw in that video?

A. In my opinion, there were.

Q. And what is that opinion?

A. The biggest thing that I saw was the fact that her limbs at one point were allowed to just free-fall, I will say. And in my perspective, that was a huge sign of someone who is basically incapacitated. If your arm falls freely—if you pick it up and drop somebody's arm and it just falls down, that's someone who has no control.

Q. Any other signs that you recognized in that video?

A. That was the prime primary one, was looking at that. And no reflection, no actions that appeared to be initiated by her, but the free-falling arm was the most significant to me.

Mr. Glover testified based on his review of the video, in his opinion, T.B. appeared impaired and did not appear alert or conscious in the video. When asked if "there's a disconnect between being aware of things in the moment while they're happening and being able to recall them later" when you have CNS depressants, Mr. Glover answered, "Yes." When asked if the CNS depressants would cause someone to go into a deeper sleep, Mr. Glover testified it would because it's a "compromised CNS system."

After testimony was complete, Defendant motioned to dismiss both charges, and the trial court denied the motion as to both charges. A jury found Defendant guilty of both sexual battery and secret peeping on 11 July 2024.

Defendant timely appeals.

## II.    Analysis

The issue on appeal is whether the trial court erred by denying Defendant's motion to dismiss the charge of felony secret peeping. Defendant argues "[s]ince [he] did not film [T.B.] 'secretly or surreptitiously,' the State failed to present substantial evidence sufficient to withstand [Defendant's] motion to dismiss." We disagree.

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Golder*, 374 N.C. 238, 249, 839 S.E.2d 782, 790 (2020) (quoting *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824, 826 (2015)). "Substantial evidence is [the] amount . . . necessary to persuade a rational juror to accept a conclusion." *Id.* (alterations in original). "In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered 'in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom.'" *Id.* at 249–50, 839 S.E.2d at 790 (citation omitted). In other words, if the record developed at trial contains "substantial evidence, whether direct or circumstantial, or a combination, 'to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.'" *Id.* at 250, 839 S.E.2d at 790 (citation and internal marks omitted). "Whether the State presented substantial evidence of each essential element of the offense is a

question of law; therefore, we review the denial of a motion to dismiss de novo." *Id.* (quoting *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018)).

Furthermore, "[i]t is not the job of this Court, nor that of the trial court, to weigh the evidence; we must determine only whether the State presented substantial evidence such that a reasonable juror might accept the evidence as adequate to support a particular conclusion." *State v. Bracey*, 297 N.C. App. 136, 139, 909 S.E.2d 883, 885 (2024) (citations omitted). "It is the function of the jury to determine the facts in the case from the evidence and to determine what the evidence proves or fails to prove." *Id.* (quoting *State v. Taylor*, 64 N.C. App 165, 169, 307 S.E.2d 173, 176, (1983)).

The charge of secret peeping is explained by the following statute:

> (f) Any person who, for the purpose of arousing or gratifying the sexual desire of any person, secretly or surreptitiously uses or installs in a room any device that can be used to create a photographic image with the intent to capture the image of another without their consent shall be guilty of a Class I felony.

N.C. Gen. Stat. § 14-202(f) (2023). Defendant's argument rests on whether his recording T.B. was done "secretly or surreptitiously." Defendant supports his argument by contending the video could not have been filmed secretly or surreptitiously because the video was filmed "directly in front of [T.B.] without any effort to hide or conceal the camera" and, "[w]hile [T.B.] appeared to be sleeping when the video was taken, the person filming the video took multiple steps to interact with

[T.B.]—including pinching her nipples and manipulating her arms and hand." We disagree.

"Absent a compelling contextual or controlling judicial definition, our courts rely on accepted dictionaries to determine plain meaning." *State v. Jenkins*, ___ N.C. App. ___, ___, 923 S.E.2d 524, 533, 2025 WL 2232043, at \*7 (2025) (first citing Scalia & Garner, *Reading Law* 415–24; and then citing *Clark v. Sanger Clinic, PA*, 142 N.C. App. 350, 356, 542 S.E.2d 668, 673 (2001)). Black's Law Dictionary defines "secret" as "[s]omething that is kept from the knowledge of others or shared only with those concerned; something that is studiously concealed." *Secret*, Black's Law Dictionary (12th ed. 2024). The American Heritage College Dictionary defines "secret," in part, as "[k]ept hidden from knowledge or view[,]" or "[o]perating in a hidden or confidential matter." *Secret*, The American Heritage College Dictionary (3rd. ed. 1997). "Surreptitious" means "unauthorized and clandestine; done by stealth and without legitimate authority." *Surreptitious*, Black's Law Dictionary (12th ed. 2024). "Surreptitious" is also defined as "[o]btained, done, or made by clandestine or stealthy means." *Surreptitious*, The American Heritage College Dictionary (3rd. ed. 1997). These definitions of surreptitious correspond with this Court's definition of surreptitious in *State v. Ross*, 249 N.C. App. 672, 792 S.E.2d 155 (2016), as applied to safecracking charges under N.C. Gen. Stat. § 14-89.1. *Ross*, 249 N.C. App. at 677, 792 S.E.2d at 159 (citing Black's Law Dictionary 1458 (7th ed. 1999)).

Defendant quotes our Supreme Court that the word "secretly" in section 14-

202 "conveys the definite idea of spying upon another with the intention of invading her privacy." *In re Banks*, 295 N.C. 236, 242, 244 S.E.2d 386, 390 (1978).[1]  Contrary to Defendant's interpretation, this use of "spying" supports the understanding that under section 14-202(f) the use of the device to "secretly or surreptitiously" record requires substantial evidence that T.B. was unaware or lacked knowledge of the recording and did not consent to the recording.  Stated otherwise, Defendant lacked authority to record the video.  *See State v. Mann*, 237 N.C. App. 535, 540–41, 768 S.E.2d 138, 142–43 (2014) (holding "any charge brought under [section] 14-202 denotes an act by which the defendant has spied upon another without that person's consent" and stating "strong language indicates that [the] defendant intended to capture images of [the victim] without her consent, since terms such as 'feloniously,' 'unlawfully,' 'surreptitiously,' and 'victim' clearly allege that [the] defendant has done something to another person [ ] without that person's consent").

Further, Defendant cites multiple cases in support of his argument "some attempt to hide or conceal one's surveillance from the victim is necessary for a conviction of felony peeping." *See State v. Anderson*, 194 N.C. App. 292, 303, 669 S.E.2d 793, 800 (2008) ("[The] defendant placed a hidden camera in his

---

[1] In *In re Banks*, the statute at issue was a predecessor of section 14-202(f) with a different text.  Section 14-202 at that time said, "Secretly peeping into room occupied by female person.  Any person who shall peep secretly into any room occupied by a female person shall be guilty of a misdemeanor and upon conviction shall be fined or imprisoned in the discretion of the court."  295 N.C. at 238, 244 S.E.2d at 388 (quoting N.C. Gen. Stat. 14-202 (1953)).

stepdaughter's room and used the camera to observe her."); *State v. Bivins*, 262 N.C. 93, 94, 136 S.E.2d 250, 250 (1964) ("[The defendant] was seen with his face pressed against the wire screen peering into the room" through a gap beneath the blinds.); *State v. Peterson*, 232 N.C. 332, 332, 59 S.E.2d 635, 635 (1950) ("[A] State's witness testified he saw the defendant looking through a venetian blind into a room usually occupied by a woman."). Importantly, "surreptitiously" was not added to the secret peeping statute until 2003. 2003 N.C. Sess. Law 843, S.L. 2003-303. Still, while each of these cases certainly presented defendants whose actions constituted secret peeping, none of these cases constrain the definition of "secret" to absolve the actions of Defendant in this case. Rather, the text of section 14-202(f), as defined above, requires a victim's lack of knowledge, awareness, and consent as a critical component of section 14-202(f), but the statute does not require concealment nor does it require the device to be hidden from view. *See Mann*, 237 N.C. App. at 540, 768 S.E.2d at 142; *Secret*, Black's Law Dictionary ("Kept hidden from knowledge *or* view." (emphasis added)); *Surreptitious*, Black's Law Dictionary.

Defendant contends that, because the video showed T.B.'s nipples being fondled and T.B.'s hand being manipulated to masturbate Defendant, the video could not have been recorded secretly or surreptitiously because it was filmed in front of T.B. and she was being touched. However, the critical component is whether T.B. lacked knowledge or awareness of the recording, as well as whether Defendant intended to record T.B. without her consent to the recording. Regarding other sexual

offenses, our Supreme Court has held lack of consent to be implied if a person is "asleep, unconscious, or otherwise incapacitated," *State v. Moorman*, 320 N.C. 387, 392, 358 S.E.2d 502, 505 (1987), and we apply that logic to the section 14-202(f) offense here. For the section 14-202(f) charge in this case, the State needed to present substantial evidence that Defendant recorded T.B. without her knowledge and authority or consent. We hold the State did present substantial evidence.

Here, the State elicited evidence during examination that T.B. ingested multiple CNS depressants prior to and during her time at Defendant's home, including a prescription muscle relaxer, beers, and whiskey, as well as marijuana exacerbating the already incapacitating influence of the three CNS depressants. T.B. testified Defendant offered her the joint, attempted to have her drink more over the course of the night, and observed her drinking and remarked she was "a little intoxicated." T.B. also testified she rebuffed Defendant's high-five, telling him she was "not an affectionate person," did not consent to anything in the video, was unaware of the video at the time it was recorded, and verbally stated her intention to leave Defendant's home multiple times. Further, the State submitted Mr. Glover's report, which concluded based on his review of the video and calculations of the CNS depressants and marijuana T.B. ingested that T.B.'s "BAC from midnight onward would have been significant with respect to its impairing effects" and T.B. "would have been mentally incapacitated and[/]or physically helpless to the contact in this case due to the ingested substances." The State also elicited testimony from Mr.

Glover in which, based on his experience, he testified that the lack of movement or any initiation of movement and "free-falling" nature of T.B.'s limbs in the video indicated she was impaired, not alert, incapacitated, and unconscious.

Further, the State produced the video at issue as evidence, and elicited testimony from T.B. confirming it was her in the video and the bedding and clothing of the man in the video was Defendant's. Thus, in the light most favorable to the State, with the State's evidence establishing the essential elements that Defendant intended to record T.B. without her knowledge and authority or consent to gratify his sexual desire, the State produced substantial evidence for a rational juror to accept the conclusion of Defendant's guilt regarding the felony secret peeping charge. Thus, the trial court did not err in denying Defendant's motion to dismiss.

## III.    Conclusion

We hold there was no error in the trial court's decision to deny Defendant's motion to dismiss the felony peeping charge because the State produced substantial evidence of felony secret peeping.

NO ERROR.

Judges STROUD and COLLINS concur.

Report per Rule 30(e).