An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-598

Filed 6 May 2026

Surry County, Nos. 24CR000142-850, 23CR428842-850

STATE OF NORTH CAROLINA

v.

JOSHUA ROBERT LAIL, Defendant.

Appeal by defendant from judgment entered 5 December 2024 by Judge Martin B. McGee in Surry County Superior Court. Heard in the Court of Appeals 11 February 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Kerry M. Boehm, for the State.*
>
> *Tin, Fulton, Walker & Owen, PLLC, by Zachary Ezor, for defendant-appellant.*

FLOOD, Judge.

Defendant Joshua Robert Lail appeals his conviction for assault with a deadly weapon upon a governmental officer pursuant to N.C.G.S. § 14-34.2. On appeal, Defendant asks that we invoke Rule 2 of our Rules of Appellate Procedure to review his argument that the evidence was insufficient for a reasonable trier of fact to find

- 1 -

he assaulted the officer in question. He also argues the trial court reversibly erred in trying the habitual felon charge without a jury. Because we hold the evidence was insufficient for a reasonable trier of fact to find he assaulted the officer, thereby vacating both convictions, we need not reach the merits of his second argument.

## I. **Factual and Procedural Background**

This case concerns an encounter between Defendant and Kaden Wilson, an officer of the Mount Airy Police Department, the vast majority of which was captured on Officer Wilson's body camera in a transaction lasting a total of approximately two minutes. On 5 October 2023, Officer Wilson received a call from dispatch to address "a suspicious person causing a disturbance" at a strip mall in Mount Airy. When he arrived, Officer Wilson encountered Defendant walking to the side of the strip mall, with bystanders indicating "that [Defendant] had just cursed several of the employees out." Officer Wilson approached Defendant from behind as he walked along a small service road abutting the strip mall complex, and, as Officer Wilson approached, he shouted, "hey, come here" at Defendant.

Within five seconds—albeit after placing a beer can on the ground—Defendant turned, faced Officer Wilson, and placed his hands in the air, holding his phone in his left hand and dangling two lanyards from his right thumb and left wrist. The lanyard on his left wrist had a black bifold knife attached to the end of it. As Officer Wilson approached Defendant, he said "you ain't gonna act like that" and asked for Defendant's name. Defendant, still holding his hands in the air and wearing a wide-

eyed expression, said "I'm leaving," then told Officer Wilson his full name. Officer Wilson then asked for Defendant's identification.

Defendant tried to pick his beer can back up, and Officer Wilson responded, "nope, you can't have it in public, quit. Put the beer can down on the ground! You can't have that in public." Defendant said, "I'm taking it home," to which Officer Wilson responded, "no, you're gonna dump it out." Defendant slurred a few words about the Fourth Amendment, resulting in a brief yet confused back-and-forth between the two men, at which point Officer Wilson stated "you're causing a civil disturbance *and* you've got an open container in public. And you're actually—you're drunk in public." Defendant replied, "no I'm not." Officer Wilson then said, "you need an ID on you," and Defendant responded, "I have an ID on me" while walking away from Officer Wilson and searching through his pocket. Officer Wilson began walking toward Defendant, saying "gimme your ID." Defendant said "yup" while continuing to search through his pocket.

Officer Wilson—who had, by this point, walked ahead of Defendant—once again repeated "let me see your ID" while placing a hand on Defendant's upper body, at which point Defendant responded, "hot damn, Wilson." Officer Wilson repeated once again "let me see your ID" with his hand still on Defendant's chest, and Defendant responded, "I know, but you're already touching me" as Officer Wilson shoved Defendant in the shoulder and placed his other hand on Defendant's chest. Defendant continued searching through his pocket during the exchange. At this point

in the conversation, less than a minute had elapsed between Defendant becoming aware of Officer Wilson. The lanyard with the knife was still visibly attached to Defendant's wrist.

Defendant began to say "like, walk with me—" before Officer Wilson interrupted him, saying "gimme your ID. Give me your ID, I'm not gonna tell you again." Defendant continued to attempt to explain his behavior, glancing at a stack of cards he produced from his pocket and saying, "it's got my credit cards, hold on." Officer Wilson, still placing his hand on Defendant's chest, pointed to a concrete stoop at the back of the complex and said, "stop. Sit down right here. Sit down right here! Sit. Down. Right here." By this point, Defendant had stopped walking and was maintaining eye contact with Officer Wilson. Defendant and Officer Wilson were in a publicly visible location with at least one moving vehicle in close proximity.

Defendant, still looking at Officer Wilson, quietly said, "God damn, Wilson, I don't have anyone; I'm on parole; I've got a fuckin' ankle monitor. I was at the restaurant when—" at which point Officer Wilson said, "have a seat," gesturing again at the stoop. Defendant hung his head and continued slowly examining his possessions, one of which was the knife that had been on the lanyard attached to his left wrist throughout the entire transaction. At the time, Defendant had multiple possessions in each hand. When Officer Wilson became aware that the knife was in Defendant's hand, he yelled "put the knife down. Put the knife down!" Officer Wilson immediately grabbed Defendant's arm and removed the knife from his hand. At no

point while holding the knife did Defendant open the knife, stop canvassing his other possessions, hold the knife in the direction of Officer Wilson, drop the stack of cards he was holding in the same hand as the knife, or drop the possessions in the hand opposite the knife. Defendant furrowed his brow and said, "wow." Officer Wilson then spent the next thirty seconds wrestling Defendant to the ground while Defendant asked him to stop and cried for help.

Subsequently, Defendant was indicted for assault with a deadly weapon upon a governmental officer and attaining habitual felon status, and he appeared *pro se* at his bench trial on 4 December 2024. At trial, Officer Wilson testified for the State, describing the events of 5 October 2023 from his perspective. The factual narrative substantially recapitulated the contents of the body camera footage; however, Officer Wilson offered some testimony to characterize how he perceived Defendant, including that Defendant was "[v]ery standoffish, . . . saying he just wanted to go home or wanted to leave"; that he "had to physically stop [Defendant] from walking away from [him]"; that Defendant was "aggressive"; and that the perceived aggression was "escalating[.]"

When Officer Wilson reached the point in his testimony where he described Defendant's behavior with the knife, he testified as follows:

> [Officer Wilson:] I noticed in his left hand, he was holding some items, and along with the knife that was attached to the lanyard was actually in his hands. And from my point of view, I believe that he was trying to open that knife.

[The State:] Okay. Had that knife previously been in his left hand when he had been walking away from you?

A. Not that I recall.

Q. Okay. And you said that it looked like he was trying to open it. Can you describe what it looked like to you?

A. It was a maybe three- or four-inch knife. I believe it had some blue in color on the handle.

Q. Is that the same knife that had previously been on a cord, as you described it, on his wrist area?

A. Yes.

Q. Did you see when he put it in his hand?

A. I did not.

. . . .

Q. Previously, before you noticed the knife being in his hand, what was he doing, if you remember?

A. I don't remember.

. . . .

Q. . . . And, Officer Wilson, as you were packaging that knife -- and I'm moving forward a little bit -- were you able to look at that knife and see how it opens?

A. It appeared that there is a mechanism on the back of the knife that you have to depress in order for the blade to come out.

. . . .

Q. Okay. Is that why the knife is taped and secured in that evidence bag?

A. Yes.

Q. Okay. And when you saw him with the knife in his hand, did it appear to you he was trying to open that knife?

A. To me it did.

Q. Okay. And were you in fear of harm?

A. Yes, I was.

Q. Did you believe he was going to stab you?

A. Yes.

Q. Okay. What did you do next when you observed the knife?

A. I gave him two instructions to put the knife down. I then approached him, grabbed the knife from his hand, tore it from his lanyard, discarded it on the ground, and attempted to place him in handcuffs.

Q. And did he resist or fight with you at that point?

A. He did.

Q. Okay. Can you describe that for the Court?

A. While trying to place him in handcuffs, he pulled away from me, jerked from me, tried to get away from me. I had to -- I was able to actually get him on the ground to attempt to place him in handcuffs, and he continually resisted by pulling away, rolling, jerking, locking his arms up.

Defendant attempted to make several legally nonspecific objections throughout this testimony.

The State, in addition to presenting Officer Wilson's testimony, presented the

trial court with Officer Wilson's body camera footage from that day. Officer Wilson represented that the footage had not been edited or manipulated in any way. When asked if the footage "fairly and accurately represent[ed] the incident that happened on October the 5th of 2023[,]" Officer Wilson responded "[y]es, it does."

At the close of all evidence, the trial court made findings of fact in open court that the State had proven assault with a deadly weapon upon a governmental officer beyond a reasonable doubt:

> Well, so I'm just going to go ahead and I'm going to just talk through it with you all. In this case, I would find beyond a reasonable doubt that the witness is an officer who was testifying and is own duty, performing a duty of his office, his own duty -- that duty being the investigation of a disturbance, and an open container. I would find that the knife, which is the State's Exhibit 1, is a relatively large folding pocket knife. I would find that that is a dangerous weapon. And would find that he -- the officer is an officer of Mount Airy on duty.
>
> With regard to the assault, I would find that the officer was conducting a lawful investigation at the time. Mr. Lail was not following lawful commands of the officer and the officer's attempt to detain him. Mr. Lail initially had his knife on the lanyard. The officer was attempting to get him to be seated. Mr. Lail was not compliant. Mr. Lail moved the knife from his -- dangling from his lanyard to his hand. The officer testified credibly that he believed that Mr. Lail was attempting to open the knife. I find that the officer reasonably believed or feared for -- felt threatened and feared for his safety.
>
> And I would find that based on the reasoning *State v[.] Barksdale*[, 181 N.C. App. 302 (2007)], there was sufficient evidence to go forward . . . beyond motion to suppress. And would find also sufficient evidence to find beyond a

reasonable doubt that he is guilty of this offense, which we saw.

Defendant made three nonspecific objections during and after these findings.

Defendant was convicted of assault with a deadly weapon upon a governmental officer, and, based on that conviction, further convicted of attaining habitual felon status, with a sentence of 114 to 149 months of imprisonment.

## II. <u>Jurisdiction</u>

This Court has jurisdiction to review this appeal from a final judgment of a superior court pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

"Rule 10(a)(3) of the North Carolina Rules of Appellate Procedure[,]" however, "provides that, in a criminal case, to preserve an issue concerning the sufficiency of the State's evidence, the defendant must make 'a motion to dismiss the action . . . at trial.'" *State v. Golder*, 374 N.C. 238, 245 (2020) (quoting N.C. R. App. P. 10(a)(3)). The Record in this case reflects—and Defendant concedes—that his argument pertaining to the sufficiency of the evidence was not preserved by objection at trial and, therefore, ordinarily would merit dismissal on appeal. *See, e.g.*, *State v. Smith*, 292 N.C. App. 662, 666, *cert. denied, stay denied*, 899 S.E.2d 372 (N.C. 2024); *State v. Hodges*, 925 S.E.2d 653, 656 (N.C. Ct. App. 2026); *see also Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 401 (2005) ("The North Carolina Rules of Appellate Procedure are mandatory and failure to follow these rules will subject an appeal to dismissal." (citation and internal quotation marks omitted)). He therefore asks that we employ

Rule 2 of our Rules of Appellate Procedure to review the merits of his motion to dismiss, notwithstanding his failure to object.

Rule 2 of our Rules of Appellate Procedure provides that,

> [t]o prevent manifest injustice to a party, or to expedite decision in the public interest, either court of the appellate division may, except as otherwise expressly provided by these rules, suspend or vary the requirements or provisions of any of these rules in a case pending before it upon application of a party or upon its own initiative, and may order proceedings in accordance with its directions.

N.C. R. App. P. 2 (2025). "While an appellate court has the discretion to alter or suspend its rules, exercise of this discretion should only be undertaken with a view toward the greater object of the rules"; therefore, "Rule 2 must be applied cautiously." *State v. Hart*, 361 N.C. 309, 315–16 (2007). "Fundamental fairness and the predictable operation of the courts for which our Rules of Appellate Procedure were designed depend upon the consistent exercise of this authority." *Id.* at 317.

Our Supreme Court has stated that, where "the evidence is insufficient to sustain a criminal conviction, . . . it will not hesitate to reverse the conviction, *sua sponte*, in order to 'prevent manifest injustice to a party'" pursuant to Rule 2. *State v. Booher*, 305 N.C. 554, 564 (1982) (quoting N.C. R. App. P. 2). We have likewise stated, for purposes of Rule 2, that "it is difficult to contemplate a more 'manifest injustice' to a convicted defendant than that which would result from sustaining a conviction that lacked adequate evidentiary support[.]" *State v. Gayton-Barbosa*, 197 N.C. App. 129, 135 (2009). While we do not lightly undertake appellate review in contravention

of our Rules of Appellate Procedure, we find it appropriate to utilize Rule 2 when a historically recognized form of manifest injustice is apparent from the Record.[1] For the reasons stated below, no reasonable trier of fact—even in the light most favorable to the State—could have concluded the State's evidence established the essential element of assault in the charges against Defendant; accordingly, we invoke Rule 2 to reach the merits of Defendant's argument.

## III. **Analysis**

When reviewing the sufficiency of the State's evidence, we must address "whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Winkler*, 368 N.C. 572, 574 (2015) (quoting *State v. Mann*, 355 N.C. 294, 301 (2002)). "Substantial evidence is [the] amount of relevant evidence necessary to persuade a rational [factfinder] to accept a conclusion." *Id* (citation omitted). "In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered in the light most

---

[1] We also separately emphasize that our invocation of Rule 2 in this case solely concerns the adequacy of the State's evidence and is not predicated on Defendant's *pro se* status at trial. To be clear, a defendant who elects to proceed *pro se* is held to the same standards as a represented party provided that he is adequately apprised of the consequences of his decision pursuant to N.C.G.S. § 15A-1242. *See* N.C.G.S. § 15A-1242 (2023) (setting out three findings the trial court must make before a defendant is "permitted at his election to proceed in the trial of his case without the assistance of counsel"); *see also Faretta v. California*, 422 U.S. 806, 835 (1975) ("When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel."). Here, where the trial court observed all proper procedures in permitting Defendant to proceed *pro se*, it would be inappropriate to consider that aspect of the trial proceedings in determining whether to invoke Rule 2. Nonetheless, the State's burden is not diminished simply because the defendant in a given case elects to proceed *pro se*, and Defendant in this case is likewise no *less* entitled to Rule 2 review than a represented party whose conviction was achieved through similarly deficient evidence.

favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *Golder*, 374 N.C. at 249–50 (citation and internal quotation marks omitted). All evidence, "whether direct or circumstantial, or a combination," may suffice "to support a finding that the offense charged has been committed and that the defendant committed it[.]" *Id.* at 250 (citation and internal quotation marks omitted). Even so, "[e]vidence is only sufficient in the context of a criminal trial if, taken in the light most favorable to the State, it permits a rational [trier of fact] to find the existence of each element of the charged crime *beyond a reasonable doubt*." *State v. Harris*, 361 N.C. 400, 404 (2007) (emphasis added) (citation and internal quotation marks omitted). "Whether the State presented substantial evidence of each essential element of the offense is a question of law," reviewable de novo. *State v. Chekanow*, 370 N.C. 488, 492 (2018).

In considering the sufficiency of the evidence in this case, we are cognizant that, by Officer Wilson's own testimony, the body camera footage was an accurate visual and audio depiction of the events that transpired between himself and Defendant; thus, his verbal description of the events was, by the State's account, recapitulative of the events depicted in the video footage and not in conflict with them. The corroborative status of Officer Wilson's testimony *vis a vis* the body camera footage is supported by the fact that, when describing the events before and during the act of alleged assault, Officer Wilson testified almost exclusively to his subjective perception of Defendant's behavior, not the contents of the behavior itself. Thus, in

the light most favorable to the State, the events depicted in the body camera footage are the controlling factual account for purposes of reviewing the sufficiency of the evidence.

Under N.C.G.S. § 14-34.2, "any person who commits an assault with a deadly weapon upon an officer or employee of the State or of any political subdivision of the State[] . . . in the performance of an official duty is guilty of a Class E felony." N.C.G.S. § 14-34.2 (2023). Defendant concedes, and we agree, that the status of Officer Wilson as an "officer . . . in the performance of an official duty" and the status of the knife as a "deadly weapon" are not seriously in dispute. *Id*. Therefore, we consider whether the evidence was sufficient, in the light most favorable to the State, *see Golder*, 374 N.C. at 249–50, to show Defendant's behavior with the knife constituted an "assault."

"Although our statutes criminalize the act of assault, '[t]here is no statutory definition of assault in North Carolina, and the crime of assault is governed by common law rules.'" *State v. Floyd*, 369 N.C. 329, 335 (2016) (citation omitted) (quoting *State v. Roberts*, 270 N.C. 655, 658 (1967)). Notwithstanding the lack of statutory definition, the ubiquitous definition of "assault" employed by our Supreme Court is "an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which . . . must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm." *State v. Dew*, 379 N.C. 64, 70 (2021) (citation omitted); *Floyd*, 369 N.C. at 335; *State v. Mitchell*, 358 N.C. 63, 69–70 (2004); *State v. Wortham*,

318 N.C. 669, 671 (1987); *Roberts*, 270 N.C. at 658. This definition extensively qualifies the act forming the requisite basis for an assault: if established by an act or attempt, it must be "overt"; if established by the appearance of an attempt, it must be "unequivocal"; and the allegedly assaultive behavior itself—described using an objective, rather than subjective, standard—"must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm." *Dew*, 379 N.C. at 70 (citation omitted); *see Standard*, Black's Law Dictionary (12th ed. 2024) (defining "objective standard" as "[a] legal standard that is based on conduct and perceptions external to a particular person[;] [] [i]n tort law, for example, the reasonable-person standard is considered an objective standard because it does not require a determination of what the defendant was thinking"); *Dickens v. Puryear*, 302 N.C. 437, 445 (1981) (defining the tort of assault identically with the crime of assault (citing *Roberts*, 270 N.C. at 655)).

As discussed above, the footage in this case reflects, even in the light most favorable to the State, that Defendant was slowly examining his possessions, holding the closed knife in his hand among several other items, when Officer Wilson noticed that Defendant was holding a knife and began reacting to Defendant. Assuming *arguendo* that the status of holding a knife among several other objects is an "act," no rational trier of fact could find beyond a reasonable doubt that such an act was undertaken with "force or violence." *See Dew*, 379 N.C. at 70; *Winkler*, 368 N.C. at 574. Alternatively, if the State's aim was to prove the crime by the appearance of an

attempt, no rational trier of fact could have believed beyond a reasonable doubt that a man hanging his head, both hands unwieldily full of various possessions, and examining those possessions after having been instructed to produce identification presented "the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another[.]" *Dew*, 379 N.C. at 70 (emphasis added).

Finally, to the extent both the trial court below and the State on appeal rely on *State v. Barksdale*, 181 N.C. App. 302, 307 (2007), to demonstrate Defendant's actions could be taken as sufficient to constitute an assault, *Barksdale* is distinguishable. In that case, the evidence, in the light most favorable to the State, demonstrated that the defendant fled from police for at least a quarter mile, was tackled to the ground, and "struggled vigorously" with officers as they tried to subdue him. *Id.* at 304. After the defendant was brought to the ground, the officers noticed the defendant reaching for a chrome pistol on the ground near him. *Id.* There, we reasoned that the act of reaching for a deadly weapon constitutes the "unequivocal appearance of an act or attempt" for purposes of the essential elements of assault:

> [A]fter carefully considering the applicable definition of assault, we must conclude that the elements of the offense were supported by the evidence produced at trial. In North Carolina, an assault is not simply "an overt act or an attempt" but also "the unequivocal appearance of an attempt." Even if [the] defendant's conduct—his reaching for the gun—was not in itself "an overt act or an attempt . . . to do some immediate physical injury," his conduct qualifies at least as "the unequivocal appearance of an

attempt" to harm the officers with the gun.

> Moreover, as demonstrated by the evidence introduced at trial, [the] defendant committed this unequivocal appearance of an attempt with force and violence. Indeed, in addition to the presence of the gun, the evidence also showed that defendant struggled intensely with three officers and was not subdued until he received several blows to the head. We also find, under the circumstances, that the officers' testimony was sufficient evidence to establish that a person of reasonable firmness would have feared immediate bodily harm.

*Id.* at 307. In other words, our holding was based on the idea that reaching for the gun was a course of conduct committed with force and violence when taken in the context of a vigorous physical struggle, and the defendant at least appeared to be attempting to harm the officers who apprehended him.

Here, no physical struggle took place before or during the allegedly assaultive behavior—indeed, even in the light most favorable to the State, none of Defendant's behaviors in that timeframe could be rationally described as taken "with force or violence." *See Violence*, Black's Law Dictionary (12th ed. 2024) ("The use of physical force, usu[ally] accompanied by fury, vehemence, or outrage; esp[ecially], physical force unlawfully exercised with the intent to harm."); *Force*, Black's Law Dictionary (12th ed. 2024) ("Strength or energy exerted; the cause of motion or change; esp[ecially], physical power used in pulling, pushing, pressing, attracting, or repelling[.]"). The State's evidence shows that Defendant was moving slowly and deliberately throughout the entire period of the recording where the knife was in his

hands. Indeed, it is doubtful, in light of Defendant's level of inebriation at the time of the allegedly assaultive behavior, that he was capable of exercising the level of coordination necessary to "put a person of reasonable firmness in fear of immediate bodily harm[,]" let alone "do some immediate physical injury to the person of another[.]" *Dew*, 379 N.C. at 70. There is an apparent contrast between the immediacy of the harm presented—and reasonableness of the fear of said harm—in this case and our precedent involving the threat of a near-instantaneous source of harm like gunfire. *See Barksdale*, 181 N.C. App. at 307; *see also State v. Childers*, 154 N.C. App. 375, 381 (holding the risk of physical injury was sufficiently immediate to constitute assault where the defendant "reached under [a] store's counter, 'slammed down' a revolver and challenged the officers to 'come behind the counter and get him[]'" (internal brackets omitted)).

In concluding our analysis, we are mindful of the longstanding wisdom of our Supreme Court regarding the challengingly broad spectrum of allegedly assaultive behavior:

> Although assault has been defined by this Court many times, the extreme difficulty of applying the facts to the law was recognized in the case of *State v. Hampton*, 63 N.C. 13 [(1868)], when the Court stated: "It would seem that there ought to be no difficulty in determining whether any given state of facts amounts to an assault. But the behavior of men towards each other varies by such mere shades, that it is sometimes very difficult to characterize properly their acts and declarations." Eighty-eight years later, the Court, . . . in the case of *State v. Allen*, 245 N.C. 185[] [(1956)], said: "The rules of law in respect to assaults are plain, but

> their application to the facts is sometimes fraught with
> difficulty. Each case must depend upon its own peculiar
> circumstances."

*Roberts*, 270 N.C. at 658 (italics added). The passage of an additional seventy years

since *Allen* has, unfortunately, done little to solve the line-drawing problem in our

assault jurisprudence, and distinctions in written descriptions of the evidence before

the trial court often fail to capture in vivid detail the assaultive or non-assaultive

character of a given transaction. For that reason, we emphasize that our holding in

this case is narrow, facilitated in large part by the clarity of the Record before us and

the careful review that Record permitted.

Nonetheless, even in the light most favorable to the State, the evidence in this

case was insufficient to show Defendant assaulted a governmental officer with a

deadly weapon. Moreover, because Defendant's conviction for attaining habitual felon

status was predicated on his conviction for assaulting a governmental officer with a

deadly weapon, that conviction was likewise invalid. Accordingly, we vacate the

judgment.

## IV. <u>Conclusion</u>

Though the facts of this case are exceptional, the manifest injustice that would

occur if Defendant's conviction remained merits our review of Defendant's

unpreserved challenge to the sufficiency of the evidence under Rule 2. For the reasons

explained above, no rational trier of fact could have found beyond a reasonable doubt

that Defendant's actions met the minimum requirements necessary to constitute an

assault. Consequently, Defendant's conviction for assault with a deadly weapon upon a governmental officer—and, derivatively, his conviction for attaining habitual felon status—must be overturned.

JUDGMENT VACATED.

Judge FREEMAN concurs.

Chief Judge DILLON concurs by separate opinion.

Report per Rule 30(e).

DILLON, Chief Judge, concurring by separate opinion.

I fully concur with the majority opinion. I agree that based on the evidence before us, including video of the incident, there was insufficient evidence to send the assault charge to the jury.

I write separately to note that, in so holding insufficient evidence to support an assault conviction, I do not believe the officer acted inappropriately in wrestling the closed knife away from Defendant when the officer noticed one of the items Defendant had been holding while searching for an ID was a closed knife. That is, a law enforcement officer who lawfully stops an individual who happens to be holding an object that could be used as a weapon does not have to wait to see if that individual will assault him/her with that object before taking reasonable steps to disarm the individual before continuing with the mission of the stop. That is what the officer did in this case. He wrestled the closed knife away from Defendant during the stop before Defendant made any attempt to assault the officer with the knife.